## DUKE POWER COMPANY AND THE TOWN OF HUDSON v. BLUE RIDGE ELECTRIC MEMBERSHIP CORPORATION

(Filed 20 January, 1961.)

**1. Contracts § 12—**

　　A contract will be construed to effect the intent of the parties unless such intent is contrary to law.

**2. Same**

　　The interpretation placed upon a contract by the parties themselves will ordinarily be followed by the courts.

**3. Electricity § 2—　Contract held not to preclude membership corporation from serving customers within corporate limits of municipality.**

　　A contract between a power company and an electric membership corporation, implementing State and Federal legislation in regard to rural electrification, which contract requires the corporation to purchase electricity solely from the power company for the purpose of resale "primarily" to rural homes and farm consumers who are members of the corporation and who are not located in any incorporated

city or town, *is held* not to preclude the corporation from selling to its members current purchased from the power company merely because such members reside within the corporate limits of a village, this being the intent of the parties as gathered from a construction of the contract as a whole and being consonant with the interpretation of the parties themselves, the company having served customers residing within the corporate limits of the municipality from the inception of the contract until two years prior to the institution of this action, and some several years after the municipality had annexed additional territory and ceased to be a rural area as defined by the Federal statute, USCA Title VII, § 913.

**4. Same: Utilities Commission § 3—**

The approval by the Utilities Commission of a contract between public utilities gives the contract the force and effect of an order of the Commission.

**5. Municipal Corporations § 2—**

Municipal corporations have the power to enlarge their corporate limits, and when they do so the annexed territory and its citizens are subject to all ordinances and regulations in force in the municipality. G.S. 160-453.5(f).

**6. Municipal Corporations § 18—**

A municipal corporation has power to grant franchises to public utilities, G.S. 160-2(6). The right to franchise implies the power to control for public benefit, including among other things, the right to fix reasonable rates and to specify where the franchise may be exercised to afford adequate service to the public.

**7. Same: Utilities Commission § 2—**

By delegating the power to municipalities to grant franchises to public utilities, the General Assembly did not deprive itself of the power to control specific utilities in whole or in part, or the right to delegate such authority to another agency. The right to regulate electric power companies except those municipally owned has been delegated to the Utilities Commission. G.S. 62-30.

**8. Same: Municipal Corporations § 18— Membership in electric membership corporation is not terminated by annexation by municipality.**

Where a contract between an electric membership corporation and a power company provides that the corporation should serve only its members and that neither the corporation nor the power company should acquire customers from the other, and the contract does not preclude the corporation from serving its members merely because of their residence within an incorporated village, the right of the corporation to sell current to its members who are inhabitants of the incorporated village, or who come within the corporate limits by annexation, is not prohibited by law, their membership in the corporation not being terminated by the change in character of the community from rural to urban, and the contract between the corporation and the power company having

been approved by the Utilities Commisison and thus having been given the effect of an order of the Commission.

PARKER, J., concurring.

MOORE, J., joins in concurring opinion.

APPEAL by defendant from *Farthing, J.* June 1960 Term, of CALD-WELL.

This action was begun by Duke Power Company by the issuance of summons from the Superior Court of Mecklenburg County on 17 August 1959. It was, on motion of defendant, removed to Caldwell County. Plaintiff sought injunctive relief to prohibit defendant from selling electric current or power to any inhabitant of the Town of Hudson. As a basis for the relief sought, it alleged it had a franchise from Hudson to serve that municipality and its inhabitants; it had been selling current to defendant for approximately twenty years, and was, at the institution of the action, selling current to defendant pursuant to a written contract for resale to members of defendant; current could not, by the terms of the contract, be resold in any incorporated city or town; defendant had violated and was continuing to violate the contract and interfering with it in the performance of its duties imposed by this franchise; only by injunction could plaintiff's rights be protected.

Defendant denied violation of the contract. It alleged sales only to its members, some of whom resided in Hudson; they had been receiving current from defendant for many years; the sales so made were permissive under its contract with Duke. It alleged violation of the contract by plaintiff and, because of the asserted breach, sought injunctive relief.

In January 1960 Hudson was permitted to intervene and become a party plaintiff. It alleged it was a municipality created by legislative act; that it had granted a franchise to Duke Power Company in 1950 for sixty years to supply the town and its inhabitants with electricity; it had granted no franchise to defendant; defendant was furnishing electric current to inhabitants of the town residing within the corporate limits fixed when it was created in 1905; and in addition to such service was providing electric service to citizens of the town who became citizens by extension of the corporate boundaries. It prayed that the court compel defendant to remove its property which is within its corporate limits; that defendant be permanently enjoined from constructing or maintaining electric lines within the town or from serving residents of the town.

For brevity the parties are hereafter referred to as Duke, Hudson, and Blue Ridge.

A jury trial was waived. The court found Duke was supplying Blue Ridge with current for resale, and Blue Ridge was selling current to its members residing within the corporate limits of Hudson. Some of these members were citizens of Hudson when Blue Ridge first began to supply them. Some were made citizens by annexation after they began to receive current. Duke had, but Blue Ridge did not have a franchise from Hudson. Based on the facts found as here summarized and as amplified in the opinion, the court enjoined Blue Ridge from providing electric service to any person residing inside the corporate limits of Hudson, including the annexed areas. It granted Blue Ridge permission, with approval of Hudson, to sell all of its properties inside of Hudson. It required Blue Ridge to remove, within twelve months, all its wires, poles, and appliances from the streets and all buildings situate in any portion of Hudson unless sold with the assent of Hudson. It also enjoined Blue Ridge from serving any of the citizens of Hudson so long as the present contract between Duke and Blue Ridge continued in effect.

North Carolina Electric Membership Corporation, acting on behalf of all membership corporations created pursuant to c. 117 of the General Statutes, was, upon its petition, granted permission to appear *amicus curiae.*

Defendant, having excepted to the judgment, appealed.

*L. H. Wall for Town of Hudson, plaintiff appellee.*

*Carl Horn, Jr., William I. Ward, Jr., and Townsend & Todd for Duke Power Company, plaintiff appellee.*

*Williams and Whisnant and Claude F. Seila for defendant appellant.*

*William T. Crisp for amicus curiae, North Carolina Electric Membership Corporation.*

RODMAN, J. The contract between Duke and Blue Ridge lies at the threshold of the controversy. (Actually there are two contracts, each designating a place where Duke will connect with Blue Ridge lines to furnish current, but they are identical so far as material to a decision of this case. Hence they are treated as a single instrument.) Each of these parties bases its right to relief on its interpreta-

the end of an annual period by sixty days notice from one party to the other.

The provisions pertinent to the decision of this case read:

"FOURTH: The electric power delivered hereunder is and shall be delivered for the purpose of resale primarily to rural homes and farm consumers who are members of the 'Consumer' in Caldwell County, North Carolina and who are not located in any incorporated city or town. Neither party shall furnish or offer to furnish electric energy to anyone who, at the time of the proposed service, is receiving electric service from the other, or whose premises are capable of being served by the existing facilities of the other without extension of its distribution system other than by the construction of secondary lines not exceeding 300 feet in length, nor shall either party unless ordered so to do by a properly constituted authority, duplicate the other's facilities, except insofar as such duplication shall be necessary in order to transmit electric energy between unconnected points on its lines. The electric power delivered hereunder shall be distributed by the Consumer solely to ultimate users, and shall not be sold or offered for sale by the Consumer to any person, firm, municipal or other corporation or association for resale, or sold or offered for sale by the Consumer to anyone who is receiving electric service or whose premises are capable of being served by the existing facilities (including additional secondary lines not exceeding 300 feet in length) of any municipal or other distribution system to which the Power Company sells electric power for resale, except where such municipality or other distributor refuses to furnish such service. The Consumer shall not, during the continuance of this contract, cause or permit electric power, from any source other than the Power Company, to be distributed over that portion of its system supplied with electric power delivered hereunder, without the written consent of the Power Company."

"SEVENTH: All such electric power which shall be sold or otherwise disposed of by the Consumer to any person, firm or corporation shall be sold or disposed of subject to this contract."

"TWENTY-THIRD: This contract is subject to the rates, rules, regulations and conditions of the Power Company as the same are now on file with the Utilities Commission of the State of North Carolina, and as the same may be lawfully changed or modified from time to time, and such rates, rules, regulations and conditions are made a part of this contract to the same effect as if fully set forth herein."

The contract provided that it should not be binding until approved

by Duke's Board of Directors and the Administrator of the Rural Electrification Administration of the United States.

The contract, including all of its terms and conditions, has been formally approved by the North Carolina Utilities Commission.

This is the factual background presented for interpreting the contract: Blue Ridge came into existence by virtue of provisions of c. 117 of the General Statutes. For more than eighteen years it has been purchasing electric power from Duke for resale in Caldwell County, including the Hudson area. Caldwell County with an area of 476 square miles had, according to the 1950 census, only 7,888 urban citizens, all of whom lived in the town of Lenoir. The remaining inhabitants are listed in that census as rural. Hudson, incorporated by legislative act in 1905, had, in 1950, a population of 922. The 1960 census gives it a population of 1536.

Between March 1942 and June 1954 six homes near the western boundary of Hudson within its corporate limits connected to Blue Ridge lines and have been receiving current from Blue Ridge. Duke did not at that time have a power line within 300 feet of these homes. Blue Ridge did have such a line.

In July 1956 Hudson changed a portion of its western boundary so as to include a home connected with Blue Ridge lines in October 1956.

In September 1957 Hudson changed its boundaries to include an area at its southeast corner. This action brought within its corporate limits two homes which were and had been receiving current from Blue Ridge since 1941. It also brought within the corporate limits the Hudson High School which had been receiving current from Blue Ridge since October 1955. So far as appears, Duke does not have a transmission line in this area.

In April 1959 Hudson changed its western boundary so as to bring within its corporate limits eleven homes, members of and receiving current from Blue Ridge.

The contract between Duke and Blue Ridge is headed "RURAL RESALE." Duke had a franchise from Hudson as early as 1927. This franchise was renewed in 1950.

Notwithstanding its franchise rights, Duke furnished current to Blue Ridge, which resold to its members, inhabitants of Hudson, as early as 1941. The contract between the parties made in June 1952 contained a provision identical with section FOURTH of the present contract. Notwithstanding this contract provision, Duke continued to sell to Blue Ridge for resale to its members, inhabitants of Hudson, from June 1952 until the institution of this action in August 1959.

When called upon to interpret a contract, courts seek to ascertain and give effect to the intent of the parties if that intent does not require the performance of an act prohibited by law. To interpret, we must ascertain the result which the parties intended to accomplish. Manifestly, the purpose of Duke, a private corporation, was to sell its wares (electricity) at a profit. The purpose of Blue Ridge, a nonprofit cooperative, was to promote and encourage "the fullest possibly use of electric energy in the rural section of the State by making electric energy available to inhabitants of the State at the lowest cost consistent with sound economy and prudent management . . ." G.S. 117-10.

The contract declares the current is sold "for the purpose of resale primarily to rural homes and farm consumers who are members of the 'Consumer' in Caldwell County, North Carolina and who are not located in any incorporated city or town."

Manifestly this is a mere rephrasing of the statutory purpose for which the cooperative was created. The contract does not define a rural home or a farm consumer, nor does our statute (c. 117 of the General Statutes) authorizing the creation of electric membership corporations contain a definition of a rural home or rural area. The Federal statute providing for rural electrification, Title VII, USCA, sec. 913, defines a rural area as "any area of the United States not included within the boundaries of any city, village, or borough having a population in excess of fifteen hundred inhabitants." Hudson and all of Caldwell County except the town of Lenoir were, when this contract was made, rural areas within the Federal definition.

It is, we think, manifest that the contracting parties intended to implement both State and Federal legislation relating to rural electrification. *Denny, J.*, had, prior to the execution of this contract, said: "The North Carolina legislation with respect to Electric Membership Corporations was enacted to implement the Act of Congress creating the Rural Electrification Administration . . ." *Utilities Commission v. Municipal Corporations*, 243 N.C. 193, 90 S.E. 2d 519.

The parties themselves pointedly called attention to the Federal Act by requiring approval by the Federal Administrator to make the contract binding. To hold that the phrase "who are not located in any incorporated city or town" was intended to prohibit it from serving its members residing in the village of Hudson who had been receiving current for many years would, in our opinion, do violence

crimination between members of the cooperative. We think it certain the Federal Administrator would not have given his approval to such a discrimination. It would give the same meaning to the words "primarily" and "solely," when it is manifest they were used as having different meanings.

Although this phrase had been in contracts between the parties for more than five years prior to the execution of the present contract, no such interpretation had been put on the language at the time this contract was executed, nor was such interpretation placed thereon until nearly two years had elapsed after its execution. As said by *Stacy, C. J.,* in *Cole v. Fibre Co.,* 200 N.C. 484, 157 S.E. 857; "The general rule is, that where, from the language employed in a contract, a question of doubtful meaning arises, and it appears that the parties themselves have interpreted their contract, practically or otherwise, the courts will ordinarily follow such interpretation, for it is to be presumed that the parties to a contract know best what was meant by its terms, and are less liable to be mistaken as to its purpose and intent."

We conclude the contract does not prohibit Blue Ridge from selling to its members current purchased from Duke merely because they reside within the corporate limits of Hudson.

This conclusion brings us to this question: Is the contract right of Blue Ridge to sell to its members who are inhabitants of Hudson invalid because legally prohibited?

The facts on which the asserted invalidity is based are summarized in Findings 6 and 7 as follows:

"6. Blue Ridge Electric Membership Corporation has been operating in areas near or adjacent to the corporate limits of the Town of Hudson for more than twenty years and has had several lines within the corporate limits of Hudson at the places, and constructed on the dates, shown on the attached Map Number 1. Prior to the institution of this action Blue Ridge Electric Membership Corporation supplied electricity to six consumers within the original corporate limits of Hudson. When Blue Ridge was advised and notified by Duke that it was supplying electricity inside the Town of Hudson it refused to withdraw from the town and still refuses to withdraw.

"7. Blue Ridge does not have and has never had a franchise from the Town of Hudson to operate within its boundaries, nor has it sought a franchise from the Town of Hudson."

The contract, having been formally approved by the Utilities Commission, is in effect an order of the Commission, binding on each of the parties. Section FOURTH of the contract in substance and effect

prevents unbridled competition between Duke and Blue Ridge, making the Utilities Commission the final authority with respect to the extension of transmission and service lines by each of the contracting parties.

Blue Ridge's right to sell in the village of Hudson electricity which Duke contracted to sell depends on the power of control delegated by the Legislature to (a) municipal corporations, (b) the Utilities Commission, (c) the North Carolina Rural Electrification Authority and membership corporations created with its approval.

Municipal corporations are permitted to expand and enlarge their corporate limits. Art. 36, c. 160, General Statutes. When so enlarged the annexed territory and its citizens are subject to all ordinances and regulations in force in the municipality. G.S. 160-453.5(f).

Every town has by statute, G.S. 160-2(6), the power to grant franchises to public utilities, that is, the right to engage within the corporate boundaries in business of a public nature. Businesses requiring sovereign permission to operate are multitudinous: transportation of goods and persons by railroad or by motor carrier, transmission of telegrams, transmission and distribution of electric power, water and sewerage systems, telephone systems, public milling, banking, transmission of gas and petroleum products by pipeline, and street railways are but illustrative of the many kinds of businesses which may require sovereign approval.

The sovereign right to franchise implies the power to control for public benefit, including among other things, the right to fix reasonable rates and to specify where the franchise may or may not be exercised so as to afford adequate service to the public. *Pue v. Hood, Comr. of Banks*, 222 N.C. 310, 22 S.E. 2d 896.

The Legislature, by granting to municipalities the right to franchise, did not deprive itself of the power to control or to delegate to other public agencies the right to control specific utilities in whole or in part. That it did not intend to give exclusive or unlimited control to municipalities by grant of the right to franchise is, we think, apparent from other legislative acts.

The power to regulate many public utilities is, broadly speaking, delegated to the Utilities Commission. Electric power companies other than those municipally owned or controlled are by express language placed under the supervision of the Utilities Commission. G.S. 62-30. This section expressly declares the Commission is vested "with all power necessary to require and compel any public utility or public service corporation . . . to provide and furnish to the citizens of this State reasonable service of the kind it undertakes to furnish . . ."

Similar directives are found in G.S. 62-27. The Commission is expressly empowered by G.S. 62-36 to prescribe rates for services in a municipality and the rates so fixed supersede those fixed by a municipal franchise. *Corp. Comm. v. Henderson Water Co.*, 190 N.C. 70, 128 S.E. 465; *Griffin v. Water Co.*, 122 N.C. 206.

G.S. 62-37 gives the Commission the power "to require such improvements and extensions to the service of public service corporations mentioned in § 62-36 as it may deem necessary . . ." It is given the power "to order the lines and right of way of any utility, railroad or electric membership corporation . . . to be crossed by any other utility or electric membership corporation . . ." G.S. 62-54. It is given the power to fix the speed of trains passing through towns at a rate different from that prescribed by municipal ordinance. G.S. 62-60. It may compel telephone and telegraph companies to make connections for continuous service, G.S. 62-73, and to furnish service to any not served, G.S. 62-74.

A utility cannot begin operation unless and until it has obtained a certificate of public convenience and necessity from the Utilities Commission. G.S. 62-101.

The cited sections of our statute law clearly indicate, we think, a legislative delegation of power to the Utilities Commission to say when and under what conditions power companies shall furnish service, and this authority relates to service inside of as well as outside of municipalities. The reason for such legislative action is, we think, readily apparent. Except for those areas served by municipally owned plants or electric membership corporations, the citizens of the State depend primarily on four power companies, Duke, Carolina Power & Light, Virginia Electric & Power, and Nantahala Power & Light, to supply them with current. To invest each of the towns served by these companies with the power to regulate and prescribe the manner in which service may be rendered inhabitants of the town might well lead to a chaotic condition seriously interfering with the ability of the utility to render equal service to all residing in the area served by it.

In *Utilities Commission v. Casey*, 245 N.C. 297, 96 S.E. 2d 8, we were called upon to decide whether the power company could sell a portion of its transmission line to Kinston, owner and operator of its own electric system, thereby depriving customers residing in an area annexed by Kinston of the power company's services. The power company had no franchise from Kinston. The power company applied to the Utilities Commission for permission to sell, asserting public convenience no longer required it to furnish service. The Com-

mission found this to be a fact over the protest of customers of the power company residing in the annexed area. *Denny, J.,* after referring to G.S. 62-27 and other sections of c. 62 of the General Statutes, said: "In our opinion, these statutes give the Commission not only the authority *but impose upon it the duty to pass upon such contracts as the one under consideration and to determine whether or not it is in the public interest to permit their consummation."* (Emphasis supplied.) The pertinency of this language to the contract between Duke and Blue Ridge is apparent. It would be difficult to find more positive language with respect to the authority of the Utilities Commission over companies selling electricity in an area annexed by a municipality.

We held in *Utilities Commission v. Wilson,* 252 N.C. 640, that a municipality could not, by the device of a franchise, procure favored treatment for itself to the detriment of other customers of a telephone company. We upheld an order of the Utilities Commission prohibiting such favored treatment.

Courts called upon to determine final authority as between municipalities and State utilities commissions over the operation of public utilities have generally interpreted the statutes in favor of utilities commissions. The reasons are manifest. *Willits v. Pennsylvania Utilities Com'n.,* 128 A 2d 105; *Jennings v. Connecticut Light & Power Co.,* 103 A 2d 535; *City of Geneseo v. Ill. Northern Utilities Co.,* 1 N.E. 2d 392; Annotation, 39 A.L.R. 1519. "Generally, however, the power given by statute to public service commissions to supervise and regulate public utilities supersedes the power of municipalities to regulate such utilities, except where the power is specifically reserved to the municipalities." 43 Am. Jur. 702.

Any person operating electric power lines has the right to construct such lines along any railroad or other public highway, but such lines shall be so constructed and maintained as not to obstruct or hinder the usual traffic on such railroad or other highway. G.S. 56-1. We need not now determine whether the word "highway" as used in that statute includes streets within municipal boundaries. This case does not raise any question with respect to the right of Hudson to require Blue Ridge to maintain its lines so as not to interfere with other rightful uses of its streets. Blue Ridge concedes Hudson's right under the police power to prescribe standards governing

the State. G.S. 117-2. It could not require power companies to extend their lines for that purpose. That power was expressly reserved to the Utilities Commission. 117-13. To accomplish its purpose, when unable to persuade power companies to extend their lines and to provide service, the Electrification Authority could authorize the creation of electric membership corporations. Every corporation so created is "vested with all power necessary or requisite for the accomplishment of its corporate purpose and capable of being delegated by the legislature . . ." G.S. 117-17.

In addition to the general power so delegated, these corporations were given by G.S. 117-18(6) the specific power, upon approval by the North Carolina Rural Electrification Authority, "to construct or place any parts of its system or lines in and along any State highway or over any lands which are now, or may be, the property of this State, or any political subdivision thereof." These membership corporations are also given express power "to make any and all contracts necessary or convenient for the full exercise of the powers in this article granted, including, but not limited to, contracts with any person or federal agency, for the purchase or sale of energy." G.S. 117-18(8).

The Legislature, by this section, made certain that when necessary to create membership corporations to provide citizens of rural areas with electricity, the corporation so created would not be hampered by having to obtain permission to function from some other agency. *Light Co. v. Membership Corp.*, 211 N.C. 717, 192 S.E. 105.

It would indeed be illogical to conclude that the Utilities Commission with its broad powers over public utilities could not require a certificate of public convenience and necessity as a condition to service, but a rural community, such as Hudson, created for general municipal purposes, could thwart legislative will and deprive its citizens of the benefits of electric service merely because the Legislature had given it the general power to franchise public utilities.

In deciding the case, we cannot overlook the fact that Duke had a franchise from Hudson as early as 1927. Notwithstanding this fact, Hudson had taken no action to compel service to all of its inhabitants, or if it had sought to force service for their benefit, the Utilities Commission in its discretion had refused to require the service, thus compelling some of its inhabitants to turn to Blue Ridge as the only source of service. Blue Ridge was, because of this failure of Hudson and Duke to provide service, rightfully serving the inhabitants of this rural community. Hudson's action in expanding its boundaries so as to remove it from the category of a rural community did not

make the original entry or its continued operation unlawful. *Sanitary District v. Lenoir*, 249 N.C. 96, 105 S.E. 2d 411.

The right of electric membership corporations to continue to provide service to those members who by annexation become citizens of a municipality has been considered by the Supreme Courts of Arkansas, Georgia, and Texas. The right to serve was in each case made to depend on proper construction of the statutes of the States in which the question was presented.

The Supreme Court of Arkansas, in *Farmers Electric Coop. Corp. v. Arkansas Power & L. Co.*, 249 S.W. 2d 837, concluded that the right of a membership corporation to serve its members terminated when they became citizens of a nonrural area by annexation.

In *City of Moultrie v. Colquitt County Rural Elec. Co.*, 89 S.E. 2d 657, the Supreme Court of Georgia held defendant had no right to serve applicants for membership who were at the time of the application citizens by annexation of a municipality which did not meet the statutory definition of a rural area. As determinative of the controversy, the Court said:

"The first requisite of a valid contract is that there shall be parties able to contract. Code, § 20-107. The Electric Membership Corporation Act, Ga. L. 1937, pp. 644, 645, Code Ann. Supp. §§ 34A-102, 34A-103, provides that such corporations can not operate within the boundaries of an incorporated city having a population in excess of 1,500 inhabitants. Whether calculated by the census of 1930 or of 1950, the City of Moultrie had in excess of 1,500 inhabitants prior to and at the time written applications were made to the petitioner for electric service. The limitation imposed by the Electric Membership Corporation Act, that corporations created under that act may operate electric lines in rural areas not receiving service from a municipal corporation or a corporation regulated by the Public Service Commission, is a limitation to be determined at the time the application for service is made."

It is interesting to note that the Georgia Legislature has enacted a law dealing with the question here under consideration. This statute is, in substance, the same as the fourth section of the contract between Blue Ridge and Duke. See c. 430, Georgia Session Laws 1960.

In *State v. Upshur Rural Electric Cooperative Corp.*, 298 S.W. 2d 805, the power company having a franchise from Gilmer, a municipality with a population in excess of 1,500, challenged the right of defendant to sell current in the municipality. With respect to those made citizens by annexation, the Court said:

"The question which we have experienced most difficulty in de-

ciding is whether the Cooperative may continue to service those persons who now reside in areas annexed to the City of Gilmer who were lawful members of the Cooperative at the time such areas were annexed to the city. The trial court held that it has that right. The cases above cited, particularly the cases from the Supreme Court of Arkansas, deny that right. While we recognize that the Act is susceptible of the construction placed upon it by the Arkansas court, still we are constrained to agree with the trial court that lawful membership once acquired is not terminated by annexation by a city of the area in which the member resides. The Act provides that membership is terminated by the resignation, expulsion, or death of the member. There is no provision that it is terminated by annexation. Since members retain that status after annexation, and since the Cooperative is expressly authorized to supply electric energy to its members, it is our view that it is authorized to continue that service to them after annexation."

Duke has by contract agreed to a limitation of the area which it may serve. This contract has been approved by the Utilities Commission. The contract may not be ignored by Duke. It contains a provision by which Duke may be permitted to provide service contrary to the cantractual restrictions. Blue Ridge has voluntarily agreed to a restriction of the area which it might otherwise lawfully serve. Blue Ridge can only provide service to its members. G.S. 117-16. Membership is not terminated by a change in the character of the community from rural to urban. Blue Ridge has the right and the duty to serve its members. The court erred in requiring it to remove or otherwise dispose of its properties within the corporate limits of Hudson.

Error and remanded.

PARKER, J., concurring. The trial court required defendant to remove within twelve months all of its wires, poles, and appliances from the streets and all buildings situate in any portion of the town of Hudson, unless sold with the assent of the town of Hudson. The Court holds this to be error. I agree upon the facts in the record before us.

However, on this question I hold the same view as expressed in my concurring opinion in *Pee Dee Electric Membership Corporation v. Carolina Power & Light Co.*, original defendant, and *Town of Rockingham, et al.*, additional defendants, 253 N.C. 610, 117 S.E. 2d 764.

MOORE, J., joins in concurring opinion.