854 P.2d 348

The CITY OF ALBUQUERQUE,
a municipal corporation,
Appellant,

v.

NEW MEXICO PUBLIC SERVICE COM-
MISSION, Public Service Company of
New Mexico, and El Paso Electric Com-
pany, Appellees.

No. 20254.

Supreme Court of New Mexico.

April 21, 1993.

David S. Campbell, City Atty., Nann Houliston, Asst. City Atty., Albuquerque, for appellant.

James C. Martin, Santa Fe, for appellee Public Service Com'n.

Keleher & McLeod, Richard B. Cole, Thomas C. Bird, Albuquerque, for appellee Public Service Co.

Cohen & Throne, David S. Cohen, Bruce C. Throne, Jane C. Cohen, Santa Fe, for appellee El Paso Elec. Co.

## OPINION

MONTGOMERY, Justice.

In 1989, the citizens of Albuquerque, New Mexico, voted to add an unusual provision to their municipal charter.[1] The pro-

---

**1.** Albuquerque is a "home rule municipality" with a municipal charter under the Municipal

Charter Act, NMSA 1978, §§ 3–15–1 to –16 (Repl.Pamp.1985 & Cum.Supp.1992), as autho-

vision, Article XV of the Albuquerque City Charter, is entitled "Competitive Bidding for Electrical Franchises" and provides:

> The City of Albuquerque shall have no power to grant or extend any franchises, licenses or other rights to provide electricity to the public or to wholesalers unless the franchise, license or right has been awarded by competitive bid to the lowest cost suppliers. The total term of any franchise, license or right shall not exceed 25 years. The City shall have the power and the mandatory duty to implement this Article through legislation. Such legislation shall maximize actual competition in the selection process, in fact as well as form. This Article shall not prohibit the grant of multiple franchises, licenses or rights for all or part of the City.

According to one of the City's briefs, this provision came about because the voting public of Albuquerque was "[f]rustrated with high electric rates, the market monopoly of the local electric supplier and the perceived inability of state regulators to adequately address rates," and thought that "competition was the answer."

This appeal was taken by the City from a "Final Declaratory Order" of the New Mexico Public Service Commission,[2] entered at the conclusion of a proceeding brought by Albuquerque's certificated electric utility, Public Service Company of New Mexico ("PNM"), to determine the validity of Article XV in light of the provisions of the New Mexico Public Utility Act ("the PUA" or "the Act").[3] The Commission's order declared that there was no facial conflict between Article XV and the PUA

and that a ruling on any possible conflict between the charter amendment and the Act as applied was premature. 127 P.U.R.4th at 483–84. The order did rule on several other points, mostly concerning the Commission's jurisdiction to entertain PNM's petition and other issues disputed by the parties to the proceeding, only one of which is involved in this appeal. Construing Section 62–6–15 of the PUA, the proper interpretation of which is at the heart of this appeal, the Commission ruled that "there is nothing in the [PUA] . . . that would support a theory that municipalities may, through franchises or contracts with public utilities, negotiate or procure rates for any retail utility customer other than for *the municipal corporation itself.*" 127 P.U.R.4th at 487 (emphasis added).

On appeal from the Commission's order,[4] the City argues for a more expansive interpretation of Section 62–6–15, under which a municipality is authorized to contract with a utility for rates not only to the municipality itself but also to its inhabitants. The City's position is resisted by the Commission, by PNM, and by El Paso Electric Company ("EPE"), an intervenor in the proceeding below ("the appellees"). The appellees argue that the City's position would contravene the Act by converting its scheme of statewide, centralized public utility regulation into one of localized, municipality-by-municipality establishment of rates through individually negotiated contracts.

For the reasons that follow, we hold that Section 62–6–15 does authorize a municipality to enter into contracts for public utility

---

rized by the home rule amendment to our Constitution, N.M. Const. art. X, § 6. Although this fact is noted in one of the appellees' briefs, the Commission did not rely on it in the order here under review, and its significance, if any, to the issues in this appeal has not been argued by the parties and is therefore not addressed in this opinion. *But see infra* note 11 and accompanying text.

2. The order is published in the *Public Utility Reports, Re Public Serv. Co.,* 127 P.U.R.4th 477, 1991 WL 501931 (NMPSC 1991). Citations to pertinent provisions of the order in this opinion appear simply as "127 P.U.R.4th at ——."

3. The PUA is compiled in various sections of Chapter 62 of the New Mexico Statutes Annotated, 1978 Compilation. *See* NMSA 1978, § 62–13–1 note (Repl.Pamp.1984) (listing statutory provisions that comprise the PUA). Unless otherwise indicated, all references in this opinion to sections of the PUA are to sections as set out in the 1984 Replacement Pamphlet of the statutes.

4. Pursuant to § 62–11–1 (party to proceeding before Commission may file notice of appeal in Supreme Court asking for review of Commission's final orders therein).

rates not only to itself for municipal purposes but also to its inhabitants. In the course of our discussion, however, we seek to make clear that our holding in no way infringes upon or diminishes the Commission's general and exclusive power to establish rates and conditions for the service rendered by a utility certificated under the PUA to provide that service within the municipality's boundaries. We hold, in other words, that the concerns of the Commission and the utility-appellees are misplaced: While Section 62–6–15 permits a municipality to contract for service rates to the municipality's inhabitants, any such contractually established rates must, before they become effective, be approved by the Commission, which retains plenary authority to approve, disapprove, or modify them.

## I.

PNM and its predecessor companies have provided electric utility service to the City and its residents since 1882. 127 P.U.R.4th at 479. PNM is therefore the holder of a certificate of public convenience and necessity to render service within the City of Albuquerque under the grandfather clause of Section 62–9–1 (Cum.Supp.1992). 127 P.U.R.4th at 479. Expressing uncertainty about its rights and duties under the PUA and Article XV, PNM filed in December 1990 a petition under the Commission's rules for a declaratory order determining whether Article XV was inconsistent with the PUA in various respects. *Id.* at 477.[5] As previously stated, the Commission declared that Article XV and the PUA are not facially inconsistent and made various other rulings, including the one challenged on this appeal—that Section 62–6–15 contemplates only a contract between a public utility and a municipality for the latter's own purposes, not a contract for the benefit of the municipality's residents.

In making its determination, the Commission relied on the absence of language in Section 62–6–15 expressly authorizing a municipality to contract "on behalf of its

inhabitants." It rejected the City's reliance on an earlier, pre-PUA opinion of this Court, *Town of Gallup v. Gallup Electric Light & Power Co.,* 29 N.M. 610, 225 P. 724 (1924), which recognized the power of a municipality to contract with a public utility for electric rates to the municipality's inhabitants. The Commission found *Town of Gallup* inapplicable because it was decided at a time when municipalities possessed the express power to regulate utility rates on behalf of their citizens. 127 P.U.R.4th at 489 & n. 6. The Commission also found that allowing municipalities to contract for rates to their inhabitants would conflict with the PUA's centralized regulatory scheme and would thwart the specific prohibition in Section 62–8–6 (Cum. Supp.1992) against establishment or maintenance by utilities of unreasonable differences in rates of service between localities. *Id.* at 489.

This appeal presents a challenge by the City to the Commission's determination that a municipality does not have the power to contract for utility rates to its inhabitants and the related issue of the impact of this power, if it exists, on the Commission's regulatory authority.

## II.

Section 62–6–15, headed "Contract rate with the municipality and utilities; how established," provides in pertinent part:

Rates and service regulations may be established by contract between the municipality and the utility for a specified term not exceeding twenty-five years, but only by and with the approval of the commission to be expressed by its order. Whenever any such contract shall be made, it shall, before becoming effective, be submitted to the commission. Unless the commission shall find the provisions of any such contract inconsistent with the public interest, the interest of the consumers and the interest of investors, it shall approve the same, otherwise it shall disapprove the same, and, unless

5. The procedural history of the proceeding before the Commission after PNM filed its petition, leading ultimately to entry of the Commis-
sion's order, is recounted in the order, 127 P.U.R.4th at 477–79.

and until so approved, such contract shall be of no effect, but if it be approved, it shall be in all respects lawful.... For the purpose of determining whether any such contract hereafter made is consistent with public interest, the commission shall hold such hearings, after notice, as may be necessary to its determination.

The parties submit two different interpretations of this provision. The City argues that Section 62–6–15 expressly preserves a municipality's power, recognized in *Town of Gallup*, to contract for utility rates on behalf of its inhabitants. It maintains that the purpose of Section 62–6–15 was to recognize this power within the PUA and to ensure that contract rates would not take effect until approved by the Commission. Appellees, on the other hand, contend that Section 62–6–15 authorizes municipalities to contract for rates for utility service to *municipal facilities only*. While appellees proffer several arguments, based on the language of the section, to support their interpretation, they rely primarily on the purpose of the Act. They essentially argue that allowing municipalities to contract for utility rates on behalf of their inhabitants would result in a decentralized scheme of utility regulation conflicting with the centralized, statewide regulatory system established by the PUA—even if, as the City acknowledges is true, the contract rates are subject to ultimate approval by the Commission.

None of the parties disputes that prior to enactment of the PUA municipalities in New Mexico had the power to contract on behalf of their inhabitants for utility rates. The issue debated is the effect passage of the PUA had on this power to contract. The appellees argue that the PUA abrogated the power of municipalities to contract for utility rates on behalf of their citizens; the City argues that this contractual power survived passage of the PUA. Our resolution of the issue requires us first to examine the nature and source of the municipal power to contract prior to enactment of the PUA; then we examine whether and to what extent the PUA altered that power.

### A.

The leading New Mexico authority before enactment of the PUA on the power of a municipality to contract for utility rates is *Town of Gallup*. In that case, the Town sought an injunction to prevent Gallup Electric Light and Power Company from charging electric rates to customers in excess of rates fixed by an ordinance and franchise under which the Company was supplying electricity to the Town. The Company responded by arguing that the Town had no authority to contract for electric rates, so that the contract or franchise rate was unenforceable.

In considering the Company's argument, this Court first quoted four statutes in the 1915 Code that the Court deemed relevant to the issue. The first provision, Section 3532, authorized a city or town to contract or be contracted with. The second and third provisions authorized a city council or town board of trustees to regulate the use of streets, Subsection 3564(7), and to grant franchises, Subsection 3564(90). The fourth provision empowered cities and towns to regulate rates for gas, electricity, and water service "to such cities or towns of this state or any of the inhabitants resident therein." Subsection 3564(93).[6]

This Court then discussed the power to contract for rates, distinguishing it from the power to regulate:

It is always to be borne in mind that the power to regulate rates is a governmental power and an entirely different and distinct power from the power to contract for rates. While it is true that the state may surrender, temporarily, this governmental power of regulation of rates to be charged the people for public service, either directly, or by granting municipalities power to make binding contracts as to rates for a reasonable time, owing to the importance to the people of the conservation of the regula-

---

6. Subsection 3564(93) was originally enacted by our territorial legislature in 1897, *see* 1897 N.M.Laws, ch. 57, § 1, and was carried forward in subsequent codifications and compilations of our statutes, *see* NMSA 1897, § 2402(93); NMSA 1915, § 3564(93); NMSA 1929, § 90–402(93).

tory power, its surrender is never to be presumed nor allowed except where so declared in express terms or by necessary implication. . . .

But there are contracts of another class which municipalities may make with public service corporations in regard to rates which are not intended by the parties to withstand the subsequent exercise of the governmental power of regulation, but which are valid as between the parties until the state elects to intervene and regulate rates. It is frequently said that such a contract is made by the municipality in its private or business capacity, not in its governmental capacity. That such contracts entered into by a municipality having the power to contract, and to regulate the use of the streets, and grant franchises, as ours have, are valid and binding upon both parties thereto, see [citations].

*Town of Gallup*, 29 N.M. at 615–16, 225 P. at 726. The Court then concluded that the Town had the power to make the contract at issue and that both parties were bound by it since the state had not attempted to intervene and exercise its regulatory power. *Id.* at 616–17, 225 P. at 726.

In holding that the Town of Gallup could contract for electric utility rates, we did not rely on the Town's separate power to regulate rates, conferred by Subsection 3564(93). Rather, we relied on the Town's statutory powers "to contract, and to regulate the use of the streets, and grant franchises." *Id.* at 616, 225 P. at 726. The presence or absence of the power to regulate rates was only relevant in determining whether a contract could withstand subsequent governmental regulation. *Id.* at 615–16, 225 P. at 726. Thus, the existence of the Town's statutory authority to regulate meant that the state had not surrendered its regulatory authority and that, had such authority been exercised, the contract would have been subject to regulation. *See id.*

### B.

■ We now consider the PUA's effect on the regulatory scheme envisioned by

*Town of Gallup* and the statutes on which it relied. Enacted in 1941,[7] the PUA significantly changed the method of public utility regulation in New Mexico. Prior to that year, New Mexico had followed a localized scheme of regulation, with individual municipalities possessing the authority to regulate public utilities. *See* NMSA 1929, § 90–402(93) (formerly NMSA 1915, § 3564(93), cited in *Town of Gallup*). Under this law, any city or town could regulate, by resolution or ordinance, utility rates for gas, electricity, and water. *Id.*

■ The PUA abolished this localized regulatory scheme and established a statewide, centralized regulatory system. Section 3 of the Act (presently compiled as Section 62–5–1) repealed Subsection 90–402(93) of the 1929 Code and created the New Mexico Public Service Commission. In Section 17 of the Act (presently compiled as Subsection 62–6–4(A)), the legislature vested the Commission with "general and exclusive power and jurisdiction to regulate and supervise every public utility in respect to its rates and service regulations ... and to do all things necessary and convenient in the exercise of such power and jurisdiction." In discharging this power (as in approving or disapproving a contract under Section 62–6–15), the Commission is to be guided by "the public interest, the interest of consumers and the interest of investors." Subsection 62–3–1(B).

With respect to rates, a public utility files schedules of rates with the Commission, § 62–8–3, and every rate is required to be "just and reasonable," § 62–8–1; § 62–8–7(A) (Cum.Supp.1992). The utility must adhere to the schedules, § 62–8–5, and the Commission must approve any proposed changes to those schedules, § 62–8–7. The Commission has authority to hold hearings on complaints by interested parties that utility rates or services are unjust or unreasonable. Section 62–10–1. The Commission can hold such a hearing, without a complaint, when the public interest or

**7.** 1941 N.M.Laws, ch. 84.

the interest of consumers and investors so requires. *Id.*

Additionally, the PUA requires a public utility that begins construction or operation of a public utility plant, or that makes an extension to any such plant, unless exempted by the grandfather clause in Section 62–9–1, first to obtain a certificate of public convenience and necessity (a "CCN") from the Commission. Section 62–9–1 (Cum. Supp.1992). The Commission has broad power under the Act to grant or refuse a CCN and to attach conditions to the issuance of a CCN. Section 62–9–6. Before obtaining a CCN, the utility must receive the consent and franchise from the municipality where the service is proposed, *id.,* but a utility may not abandon or discontinue the service for which a CCN has been issued without obtaining the Commission's permission and approval, § 62–9–5.

### III.

■■■ We agree with the City that in enacting Section 62–6–15 the 1941 legislature preserved the authority of a municipality to contract for utility rates on behalf of its inhabitants that this Court had previously recognized in *Town of Gallup.* In particular, we believe that through Section 62–6–15 the legislature intended to ease the transition for municipalities to the new state regulatory regime. As described above, the PUA repealed municipal rate-making authority and established a centralized, statewide regulatory system. This significantly changed prior law and divested New Mexico municipalities of an important power. We believe that the purpose of Section 62–6–15 was to preserve to municipalities some involvement in the regulatory process and thereby to provide a voice for ratepaying customers—residential, commercial, or industrial—within the new regulatory scheme. In this sense, a municipality contracting for service rates acts as a representative, or *parens patriae,*[8] on behalf of its inhabitants; it proposes rates

that, with the concurrence of the utility, it believes are consistent with the particular needs and circumstances of its residents. While those needs may be subordinated to statewide interests during the Commission's review of the proposed rates (as we discuss *infra*), it is nevertheless significant that the municipality can voice those needs early in the process—provided, of course, that the utility agrees, through a contract, with the municipality's perception of its inhabitants' needs.

In holding that Section 62–6–15 does not authorize municipalities to contract for rates to their inhabitants, the Commission relied on the absence of language in that section expressly authorizing a municipality to contract "on behalf of its inhabitants." It contrasted Section 62–6–15 with the language of NMSA 1915, Subsection 3564(93), which was quoted in *Town of Gallup* and which authorized cities and towns to regulate utility rates "to such cities or towns of this State *or any of the inhabitants resident therein.*" (Emphasis added.) The Commission reasoned that the presence of the latter language in Subsection 3564(93) of the 1915 Code showed that the "[l]egislature knew how to grant a municipality the power to establish rates for itself *and* its citizens" and that the absence of such language from Section 62–6–15 indicated a legislative intent to deny to municipalities the right to contract for rates on behalf of their inhabitants. 127 P.U.R.4th at 487–88.

■■■ The Commission erred in relying on Subsection 3564(93). As explained above, that provision authorized cities and towns to *regulate* utility rates; and, as this Court explained in *Town of Gallup,* the power to contract is distinct from and independent of the power to regulate. None of the statutes cited in *Town of Gallup* as authority for the municipal power to contract contained language empowering cities or towns to act "on behalf of their inhabit-

---

**8.** *Parens patriae* traditionally refers to the state's role as sovereign and guardian of persons under legal disability, such as juveniles or the insane. *Black's Law Dictionary* 1114 (6th ed. 1990). In modern times, it has become "a concept of

standing utilized to protect those quasi-sovereign interests such as health, comfort and welfare of the people, interstate water rights, general economy of the state, etc." *Id.* (citing *Gibbs v. Titelman,* 369 F.Supp. 38, 54 (E.D.Pa.1973)).

ants." *See* NMSA 1915, §§ 3532, 3564(7), 3564(90). The absence of such language, however, did not prevent this Court from recognizing the municipal power to contract for utility rates on behalf of municipal inhabitants, nor does the absence of such language from Section 62–6–15 lead us to a different conclusion today. *See Torrance County Mental Health Program, Inc. v. New Mexico Health & Env't Dep't,* 113 N.M. 593, 598, 830 P.2d 145, 150 (1992) (courts should avoid giving positive legal effect to legislative silence). The statutory powers relied on by this Court in *Town of Gallup* still exist in New Mexico and appear in our Municipal Code. *See* NMSA 1978, § 3–18–1(B) (Repl.Pamp.1985) (power to contract); § 3–49–1(A) (Repl.Pamp.1984) & § 3–18–17(B) (Repl.Pamp.1985) (power to regulate use of streets); § 3–42–1(A) (Repl.Pamp.1984) (power to grant franchises for construction and operation of public utilities).[9] We conclude that *Town of Gallup* correctly reasoned that the municipal power to contract for rates on behalf of municipal inhabitants can be inferred from the foregoing general powers. *See* 12 Eugene McQuillin, *The Law of Municipal Corporations* § 34.151 (3d ed. 1986) (power to fix rates by contract has been inferred from one or more general municipal powers).

█ We also reject appellees' interpretation of Section 62–6–15 because it would render that provision superfluous. A municipality, like any private corporation, certainly has the power to contract with a utility for service and rates to its own facilities. *See* § 3–18–1(B) (granting municipalities the right to contract) & (E) (granting municipalities other privileges incident to corporations of like character). In fact, the Commission recognizes that such contracts exist and provides in its regulations that any rates set forth in such contracts must be filed by the utility and are subject to modification by order of the Commission. *See* Schedule of Rates,

Rules, and Forms, Public Service Comm'n, NMPSC 210.22–.23 (June 30, 1988). The PUA does not expressly authorize private corporations or other entities to contract with utilities for rates, and we can perceive no reason why the legislature would have enacted a special provision to this effect just for municipalities. On the contrary, we believe that the legislature intended by Section 62–6–15 to recognize a special form of contract—one entered into by a municipality on behalf of its inhabitants—that would, like other service rate contracts, be subject to the Commission's approval.

█ We interpret Section 62–6–15 to allow municipalities to contract with a public utility for *proposed* rates and service regulations for utility service to municipal inhabitants. We emphasize "proposed" because, as Section 62–6–15 itself states, any rates or service regulations set forth in a contract do not take effect until they have been approved by the Commission. As Section 62–6–15 also provides, the Commission shall approve such proposed contract provisions *unless* it finds the provisions "inconsistent with the public interest, the interest of the consumers and the interest of investors." The latter directive does not confine the Commission merely to approving or disapproving proposed rates and service regulations. Rather, it must be read in *pari materia* with Subsection 62–8–7(D) (Cum.Supp.1992), which sets forth the procedure to be followed when the Commission determines that a proposed rate is unjust or unreasonable: The Commission can either determine the just and reasonable rate and fix that rate by order or it can direct the utility to file new rates designed to produce annual revenues no greater than those determined by the Commission in its order to be just and reasonable. Thus, the Commission retains its "exclusive power" under Subsection 62–6–

---

**9.** We note that § 3–42–1(A) does not empower municipalities to authorize public utilities to render service to municipal inhabitants. As we explain *infra* at note 12 and accompanying text, such authority resides exclusively with the Commission. We interpret § 3–42–1(A) in *pari materia* with § 62–1–3 of the PUA (cited *infra*) and as only authorizing municipalities to grant to a utility use of municipal rights of way for the utility's distribution system.

4(A) to regulate and supervise public utilities.[10]

■■■ The foregoing reasoning also supports our rejection of the Commission's argument that the City, in contracting for utility rates on behalf of its inhabitants, would "bind everyone who lives and works within the Albuquerque city limits" and that the City's contract would "override any utility contracts any such persons may have agreed to on their own." Since a proposed contract rate under Section 62–6–15 does not take effect until reviewed and approved by the Commission, the Commission determines the effect, if any, a proposed rate will have on preexisting utility contracts within the municipality. A proposed rate will not bind "everyone who lives and works" within a municipality, nor will it override other utility contracts, unless and until the Commission so determines.

### IV.

■■■ Our holding that the Commission retains plenary authority over rate-making recognizes that ratemaking is a matter of statewide rather than local concern.[11] This—perhaps among other reasons—is because a proposed service rate for one municipality can affect rates to other municipalities in the state. For example, if PNM and the City were to agree to an excessively low service rate, other PNM customers in the state might have to incur higher rates to compensate for PNM's revenue shortfall. Additionally, because ratemaking inevitably affects the financial health of a public utility, the utility's rates are always a matter of statewide concern, at least when a utility serves more than one municipality in the state. By exercising its statutory duty to review all proposed rates between municipalities and utilities, the Commission addresses these statewide concerns.

EPE nonetheless argues that, as a practical matter, chaos will result from allowing municipalities to contract with utilities for proposed rates and will prevent the

---

**10.** Our interpretation of the PUA is consistent with the United States Supreme Court's interpretation of analogous regulatory schemes in the Federal Power Act, 16 U.S.C. §§ 791a–825c (1988 & Supp. II 1990), and the Natural Gas Act, 15 U.S.C. §§ 717–717z (1988). Both Acts vest regulatory authority in the Federal Energy Regulatory Commission ("FERC"), which has power to fix rates charged by public utilities and natural gas companies. If the FERC finds that any rate or any contract affecting a rate is "unjust, unreasonable, unduly discriminatory or preferential," the Commission "shall determine the just and reasonable rate ... or contract to be thereafter observed and in force, and shall fix the same by order." 16 U.S.C. § 824e(a); 15 U.S.C. § 717d. In two cases decided in 1956, the Supreme Court recognized that, under both Acts, a public utility or a natural gas company can privately contract for rates. See FPC v. Sierra Pacific Power Co., 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956); United Gas Pipe Line Co. v. Mobile Gas Serv. Corp., 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956). However, the FERC can prescribe changes in contract rates that it finds to be unlawful. Sierra Pacific, 350 U.S. at 353, 76 S.Ct. at 371; Mobile, 350 U.S. at 341, 76 S.Ct. at 379. In Sierra Pacific, the Supreme Court held that, in determining whether a contract rate is unlawful, the FERC's sole inquiry is whether the contract rate meets the public interest, i.e., whether it might impair the financial ability of the public utility to continue its service, cast upon other customers an excessive burden, or be unduly discriminatory. Sierra Pacific, 350 U.S. at 355, 76 S.Ct. at 372. This furthers the FERC's purpose of protecting the public interest. Id. The holdings of these cases retain their validity today and are referred to jointly as the "Sierra–Mobile doctrine." See, e.g., Western Union Tel. Co. v. FCC, 815 F.2d 1495, 1501 (D.C.Cir.1987).

**11.** The distinction between matters of statewide and local concern is pertinent in the context of the home rule amendment to our Constitution, Article X, § 6, cited supra note 1. Under that amendment, a municipality adopting a home rule charter and thereby becoming a home rule municipality may "exercise all legislative powers and perform all functions not expressly denied by general law or charter." Id. § 6(D). This Court has interpreted a "general law" to be a law that relates to a matter of statewide, as opposed to local, concern. State ex rel. Haynes v. Bonem, 114 N.M. 627, 632, 845 P.2d 150, 155 (1992). Thus, in order for a statute to override an enactment of a home rule municipality, the statute must relate to a matter of statewide concern. Id. Although, as stated in footnote 1 of this opinion, this case does not directly present an issue of the impact of the PUA on Article XV of the City's municipal charter under the home rule provision of our Constitution, we believe that the distinction between matters of statewide and local concern is helpful in resolving the issues that are presented and provides additional support for our holding.

Commission from carrying out its statutory mandate. Specifically, EPE asserts that, if the Commission is only the final arbiter of the validity or invalidity of proposed contracts between utilities and municipalities, a series of Commission review proceedings will be necessary, each occurring at a different time, to consider the validity of each contract; and, according to EPE, the Commission will not be able to conduct such a municipality-by-municipality review while fulfilling its duties under the PUA to serve the statewide interest.

We do not believe that the consequences foreseen by EPE from our holding will necessarily occur; that is, we do not believe that a lengthy hearing will be necessary each time a municipality-utility contract is submitted to the Commission for approval (which we doubt will occur very often). On the contrary, the Commission can fairly easily avoid protracted "municipality-by-municipality" review. For example, the Commission might conduct, as it does now, periodic "generic" rate proceedings to determine a range of presumptively permissible rates for service by a particular utility to municipalities throughout the state. Subsequently, the Commission could approve any proposed rates within the predetermined range and disapprove, after notice and hearing, any rates not within that range. Of course, the Commission need not follow this example; it is offered merely to show that "chaos" is not an inevitable, or even a likely, result of our holding and that our holding need not, in practice, prevent the Commission from fulfilling its statutory duties.

 Additionally, we do not believe that our interpretation of Section 62–6–15 conflicts with Section 62–8–6 of the PUA. That section provides, inter alia, that "[n]o public utility shall establish and maintain any *unreasonable differences* as to rates of service either as between localities or as between classes of service." Section 62–8–6 (Cum.Supp.1992) (emphasis added). The Commission in its order reasoned that the City's interpretation of Section 62–6–15 "clearly runs athwart the unambiguous command of Section 62–8–6 because it

would seriously interfere 'with the ability of the utility to render equal service to all residing in the area served by it.'" 127 P.U.R.4th at 489 (quoting *Duke Power Co. v. Blue Ridge Elec. Membership Corp.*, 253 N.C. 596, 117 S.E.2d 812, 818 (1961)). Both PNM and EPE seize on this language from the Commission's order, referring to an "equal service" requirement in Section 62–8–6 and stating that the section "prohibits variations in rates as between localities."

 Appellees have misread the clear language of Section 62–8–6. The section does not prohibit variations in rates, nor does it require "equal service." Rather, it prohibits "unreasonable differences" in rates of service between localities. Section 62–8–6 thus forbids arbitrary variations in rates, while permitting variations due to differing costs of service to different areas. Allowing municipalities to contract with utilities for service rates to their inhabitants does not, ipso facto, violate Section 62–8–6. On the contrary, because utilities themselves may know more about the cost of service to a particular locality than the Commission, *see* 1 A.J.G. Priest, *Principles of Public Utility Regulation* 342–43 (1969), our holding may actually promote the mandate of Section 62–8–6 by allowing utilities to propose what they presumably believe to be reasonable rates based on the characteristics of the municipalities they serve. Nevertheless, if a proposed rate, even though agreed upon through a contract between a utility and a municipality, does violate Section 62–8–6, our holding recognizes the power of the Commission to disapprove and modify that rate to comply with the statutory directive.

### V.

Having said the foregoing, we feel compelled to observe that, to a considerable extent, the parties' positions on this appeal are riddled with misapprehensions and misunderstandings with respect both to their opponents' positions and to the current regulatory scheme under New Mexico law. For example, the Commission in its order stated that the City's interpretation of Sec-

tion 62–6–15 created "the likelihood of a jurisdictional conflict between the [City] and this Commission over the terms of rates and service to the [City] and to other electric utility customers within its municipal boundaries." 127 P.U.R.4th at 484. But we see no likelihood, or even a realistic possibility, of a jurisdictional conflict between the City and the Commission under current New Mexico law. What the City and an electric service provider may agree to as the consideration for the provider's use of the City's streets and rights of way is a matter of strictly local concern to the City and its inhabitants, including the provider; but, as the City acknowledges, any rate for electric service agreed to as part of that consideration is a matter of statewide concern and subject to the Commission's general and exclusive power to approve, disapprove, or modify.

■ A related misunderstanding surrounds the concept of a rate "fixed" by contract, whether as part of a general negotiation between a utility and a municipality or as part of the bidding process envisioned by Article XV of Albuquerque's city charter. A rate for utility service established in a municipality-utility contract is no more, as we have said in this opinion, than a proposal to the Commission for its approval, disapproval, or modification. It does not tie the Commission's hands in any way, and it does not undermine the Commission's discharge of its regulatory responsibilities to any extent.

This is not to say that negotiations between a municipality and a utility looking toward a proposed rate for the benefit of the municipality's inhabitants would be a meaningless exercise. For one thing, if such negotiations resulted in an agreed-upon set of rates, the utility would be effectively eliminated as a potential adversary to the municipality in the Commission's review of the rates. (This would be true, presumably, unless the utility reneged on its promise to furnish service at the agreed-upon rates.)

■ A second reason why an agreed set of rates would not be meaningless lies in the concept of "just and reasonable" rates

as falling within a zone of reasonableness, in which the rates are designed to produce a return to the utility that is not so low as to amount to utility confiscation nor so high as to constitute ratepayer extortion. We have previously endorsed the "zone of reasonableness" concept, *see Behles v. New Mexico Pub. Serv. Comm'n (In re Timberon Water Co.)*, 114 N.M. 154, 161, 836 P.2d 73, 80 (1992) (citing *State v. Mountain States Tel. & Tel. Co.*, 54 N.M. 315, 338, 224 P.2d 155, 170–71 (1950)), and now recognize it as an approach through which the Commission might choose to approve a set of rates fixed by a municipality-utility contract, if the rates fell within the zone of reasonableness, even though the Commission might prescribe different rates if left to its own devices.

The appellees misperceive this fundamental nature of contractually determined (though proposed) rates, contending that allowing municipalities to contract for utility rates on behalf of their inhabitants would conflict with the PUA's centralized, statewide regulatory scheme. For example, the Commission contends that adopting the City's interpretation of Section 62–6–15 would deprive the Commission of its plenary regulatory authority because the Commission could only turn "thumbs up" or "thumbs down" to a proposed contract rate, and that it would be "barred from undertaking its legislatively-mandated inquiry into whether other rates and service regulations might be just and reasonable." EPE goes further and argues that the City's interpretation of the statute envisions

a radically different, decentralized scheme under which New Mexico's numerous municipalities act as balkanized city-states with sovereign power to choose the utility provider of electric service for their respective inhabitants as well as establish rates for and conditions of that service based on local considerations, subject to ultimate statewide review by the Commission.

■ As should be apparent from what we have said thus far in this opinion, appellees have misconstrued the City's position

on appeal, as well as the extent of the Commission's authority under the PUA. The City does not contend that adopting its interpretation would relegate the Commission to a "thumbs-up, thumbs-down"— "yea" or "nay"—role; in fact, it expressly disclaimed this position during oral argument. As we view the City's contentions, and as we hold, allowing municipalities to contract for utility rates on behalf of their inhabitants will in no way reduce the Commission's plenary regulatory authority under the PUA.

▇▇ EPE's argument also misconceives the extent of the City's authority under Article XV of its charter. Although Article XV does speak in terms of the City's power to grant "rights to provide electricity to the public or to wholesalers," in view of the provisions of Article 9 of Chapter 62 of our statutes, reviewed *supra*, such a grant could hardly be construed to alter the Commission's "general and exclusive power" to authorize a particular provider or providers to furnish service within a given territory, through one or more CCNs, or to revoke that authority in an abandonment proceeding under Section 62–9–5.

▇▇▇ It appears that the appellees, and perhaps also the City, are laboring under the misapprehension that a "franchise" constitutes an authorization from a municipality to a public utility to render service to municipal inhabitants. To the contrary, and as we have said in our discussion of Section 62–9–1, such authority resides exclusively with the Commission. A franchise granted by a municipality to a public utility merely entitles the utility to use the municipality's streets and rights of way to construct and operate its facilities and distribution system—that is, to run its pipes, poles, wires, and cables, and to operate its towers, transformer stations, and other necessary structures. *See* § 62–1–3

(Cum.Supp.1992) (authorizing boards of county commissioners and municipal authorities to grant to public utilities, through franchises, use of rights of way for distribution systems); McQuillin, *supra*, § 34.07 (grant of right to use street is a franchise). Obtaining a franchise from a municipality is a prerequisite to obtaining a CCN, § 62–9–6, but it is not the same as obtaining a CCN. In exchange for granting a franchise, a municipality may exact consideration from the utility, usually in the form of a franchise fee. *See* McQuillin, *supra*, § 34.37. This may equal some percentage of the utility's gross revenues or net earnings, or it may equal some other proportion of the utility's income derived from providing service in the municipality. *Id.* If the municipality chooses to forego some or all of this financial remuneration and to obtain instead the utility's agreement to furnish service at a particular rate or rates, that is up to the municipality and the utility and is a matter of local concern. However, when the municipality seeks approval of the rate or rates so negotiated, the decision to place those rates into effect is a matter of statewide concern, as explained above. *See generally id.* § 34.144 (power to regulate rates must not be confused with municipality's contractual power to agree with utility upon the terms of a franchise).[12]

Finally, we believe that the City itself, and some of its citizens, may misperceive the implications of the City's position on this appeal. Although we have upheld the City's ability to contract for electric rates to its inhabitants, we do not intend our holding to foreshadow the replacement of public utility regulation as we know it in this state with competition among would-be suppliers of electricity. It may well be, as the City informs us in its reply brief, that "[t]he long-awaited winds of change are blowing in New Mexico." The City points

12. PNM's franchise with the City expired in early 1992 and has not been renewed. Nevertheless, pursuant to a determination by the Commission (which has not been appealed) in this proceeding, PNM has continued its service to customers within the City. The Commission found that PNM has a statutory duty, independent of any franchise or contract, to continue its

service until its duty is modified or terminated by the Commission. 127 P.U.R.4th at 490. The precise relationship between the City and PNM, including the financial and other aspects of that relationship, should PNM continue to operate without a franchise and the parties disagree over those aspects, is an issue not before us and we express no opinion on it.

to efforts in the United States Congress to stimulate or facilitate competition in the electric utility industry, through such devices as "wheeling" electric power from sources of generation to local distribution systems, by means of various competitive arrangements. All of these developments, and more, may occur; we have no crystal ball and can only apply New Mexico law as it is presently written to issues that may arise under arrangements like those contemplated by Albuquerque's Article XV.

PNM points out that this Court and the Commission itself have treated regulation under the PUA as a "surrogate" for competition. *See Public Serv. Co. v. New Mexico Pub. Serv. Comm'n (In re Application of Public Serv. Co.),* 112 N.M. 379, 387, 815 P.2d 1169, 1177 (1991) ("Certification regulates competition within the industry, thereby preventing overinvestment in high fixed costs and encouraging the achievement of economies of scale."); *Farmers' Elec. Coop. v. Southwestern Pub. Serv. Co.,* 125 P.U.R.4th 449, 467, 1991 WL 501885 (NMPSC 1991) ("The [PUA] expresses a clear intent to displace competition with regulation in the area of utility service."). This view of the effect of regulation on competition is almost universally held by economists and other authorities in the field of public utility regulation. *See, e.g.,* James C. Bonbright, *Principles of Public Utility Rates* 10 (1961) ("Public utility regulation, if chosen in preference to outright public ownership, is therefore said to be a substitute for competition."); Charles F. Phillips, Jr., *The Regulation of Public Utilities* 165–66 (1988) ("[R]egulation is a substitute for competition and should attempt to put the utility sector under the same restraints competition places on the industrial sector."); 1 Priest, *supra,* at 348 (" 'The introduction in the United States of the certificate of public convenience and necessity marked the growing conviction that under certain circumstances free com-

petition might be harmful to the community....' ") (quoting *New State Ice Co. v. Liebmann,* 285 U.S. 262, 282, 52 S.Ct. 371, 376, 76 L.Ed. 747 (1932) (Brandeis, J., dissenting)). As the City states, the winds of change may be blowing in New Mexico; again, we have no crystal ball. Perhaps the regulatory climate *will* change, and perhaps the panacea apparently hoped for by the City will materialize. Only time, and legislatures around the country, including Congress, will tell.

For the present, however, we are content—indeed, we are duty-bound—to recognize that the subjects of how utility rates paid by New Mexicans are to be determined, and of how providers of utility service are to be selected, remain where the legislature placed them in 1941: in the exclusive domain of the Public Service Commission. At the same time, we believe that this recognition in no way militates against our conclusion that a municipality has the ability under Section 62–6–15 to enter into a contract for utility service on behalf of both itself and its inhabitants, subject always to the Commission's plenary power to approve, disapprove, or modify any rates or service conditions provided for in such a contract.

The Commission having ruled otherwise in its Final Declaratory Order, the order is vacated and annulled; and the cause is remanded to the Commission for such further proceedings, if any, as may be appropriate and consistent with this opinion.

**IT IS SO ORDERED.**

RANSOM, C.J., and FROST, J., concur.

854 P.2d 362

# SUPREME COURT OF NEW MEXICO

## Denials of Certiorari

| Title | Docket Number | Date of Denial |
|---|---|---|
| Blakely v. State | 21220 | 5/25/93 |
| Elliott v. Las Tres Gentes | 21231 | 6/7/93 |
| Gallegos v. City of Albuquerque | 21209 | 5/20/93 |
| Jacquez v. State | 21228 | 6/7/93 |
| Jeff H. v. State | 21234 | 6/4/93 |
| Lear Siegler Management Services Corp. v. Bryant | 21216 | 5/25/93 |
| Maynes v. Contract Associates of New Mexico, Inc. | 21238 | 6/7/93 |
| Mhoon v. State | 21221 | 5/25/93 |
| Nardacci v. Hughes | 21226 | 5/26/93 |
| Tagle v. State | 21237 | 5/27/93 |
| Tavarez v. State | 21208 | 5/25/93 |
| Vasquez v. State | 21240 | 6/7/93 |
| Wood v. State | 21233 | 6/4/93 |
| Wright v. State | 21224 | 5/25/93 |

## Writ Quashed

| Title | Docket Number | Date of Denial |
|---|---|---|
| Landers v. State | 20952 | 5/27/93 |
| McFadden v. Loman | 21064 | 5/27/93 |