815 P.2d 1169

**In the Matter of the Application of Public Service Company of New Mexico for regulatory abandonment and for decertification of its 26.10% undivided interest in San Juan generating station unit 4, and in certain related common facilities:**

**PUBLIC SERVICE COMPANY OF NEW MEXICO, Appellant,**

**v.**

**NEW MEXICO PUBLIC SERVICE COMMISSION, Appellee.**

**No. 19457.**

Supreme Court of New Mexico.

July 9, 1991.

Amended on Denial of Rehearing
Aug. 29, 1991.

Keleher & McLeod, Richard B. Cole, Kathryn J. Kuhlen, Thomas C. Bird, Albuquerque, for appellant.

James C. Martin, Commission Counsel, Santa Fe, for appellee New Mexico Public Service Comm'n.

Tom Udall, Atty. Gen., Peter J. Gould, Asst. Atty. Gen., Santa Fe, for Intervenor Atty. Gen.

## OPINION

RANSOM, Justice.

The Public Service Company of New Mexico (PNM) appeals from an order of the New Mexico Public Service Commission denying PNM's application for regulatory abandonment and decertification of its interest in Unit 4 of the San Juan Generating Station (SJ-4). We affirm.

This case has its origin in events in 1975, when PNM sought and received a certificate of convenience and necessity for Units 3 and 4 of its San Juan Generating Station.[1] SJ-4, at issue here, went into commercial operation in April 1982, with an estimated minimum useful life of forty years. During the same time period that SJ-4 came into service, PNM completed the three units of Palo Verde Nuclear Generating Station (PVNGS) and entered into long term commitments to purchase power from other sources: contracts with Southwestern Public Service Company (SPS), Modesto–Santa Clara–Redding (MSR), and Los Alamos County (LAC). Projected growth in electrical demand did not materialize, however, and PNM was faced with substantial excess generating capacity.

Excess capacity was the subject of *Re Public Service Co. of New Mexico*, 101 PUR4th 126 (N.M.(P.S.C.) 1989). In that case, recently affirmed in *Public Service Co. of New Mexico v. New Mexico Public Service Commission*, 111 N.M. 622, 808 P.2d 592 (1991), the Commission fashioned a broad remedy that required exclusion of certain assets from PNM's rate base. Among the assets so excluded was approximately 130 megawatts of SJ-4 (representing 26.10% of PNM's interest therein). *Re Public Serv. Co. of N.M.*, 101 PUR4th at 176–77.

On August 28, 1989, PNM filed with the Commission an application for regulatory abandonment and decertification of PNM's interest in the assets excluded from PNM's rate base pursuant to the Commission's order in the excess capacity case. PNM also applied for regulatory abandonment and decertification of PNM's interests in certain related facilities.

On November 6, 1989, the Commission bifurcated the proceedings, and the application relating to PNM's 26.10% interest in SJ-4 was removed to Case No. 2296, the case now before us. In the other half of the bifurcated proceeding, Case No. 2285, the Commission, on May 21, 1990, issued an order granting abandonment and decertification of PNM's interest in Palo Verde Nuclear Generating Station Unit 3 (PVNGS Unit 3) and related facilities. PNM's application in that proceeding was uncontested.

A hearing on the application relating to PNM's 26.10% interest in SJ-4 was held on April 30, 1990. The Attorney General appeared in opposition to PNM's application. In support of its position, PNM urged that the Commission's final order in the excess capacity case excluding its 26.10% interest in SJ-4 required the Commission to authorize abandonment. Although PNM offered the prefiled, direct testimony of one witness, Jeffrey R. Harris, its director of planning and analysis in electrical operations, PNM relied principally upon the final order in the excess capacity case as the factual basis for its application below. On June 21, 1990, the hearing examiner recommended to the Commission that PNM's application be denied, and on August 3, 1990, the Commission entered its final order in Case No. 2296 adopting the recommendation of the hearing examiner. *Re Public*

---

1. While the decision to construct a new plant ultimately is the utility's, the Commission participates to some extent in deciding whether the plant will be built. New Mexico requires, as do many other state public utility acts, that the utility obtain prior approval from the Commission before it begins construction or operation of a new plant or system. Section 62-9-1 provides:

No public utility shall hereafter begin the construction or operation of any public utility plant or system or of any extension thereof, without first obtaining from the commission a certificate that public convenience and necessity require or will require such construction or operation.

Should the utility fail to acquire such approval the Commission, upon the filing of a complaint by any interested person, may enjoin, with or without notice, construction or operation of the facility or system. Section 62-9-6.

*Serv. Co. of N.M.,* 119 PUR4th 48 (N.M.(P.S.C.)1990).

The Commission denied PNM's application for two basic reasons. First, the Commission concluded that PNM failed to carry its burden of showing that present and future public convenience and necessity no longer required regulation of PNM's 26.-10% interest in SJ-4. *Id.* at 53. In so doing, the Commission considered the language of NMSA 1978, Section 62-9-5 (Repl.Pamp.1984), and the four decertification factors set out in *Commuters' Committee v. Pennsylvania Public Utility Commission,* 170 Pa.Super. 596, 88 A.2d 420 (1952). 119 PUR4th at 53. Second, the Commission determined that the pertinent due process standards measured by the "end result" test articulated in *Federal Power Commission v. Hope Natural Gas Co.,* 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944), and in *Duquesne Light Co. v. Barasch,* 488 U.S. 299, 109 S.Ct. 609, 102 L.Ed.2d 646 (1989), permit continuation of regulatory control over SJ-4 even though it was excluded from PNM's rate base. 119 PUR4th at 54.

We address in turn the specific issues raised by PNM in this appeal: (1) whether PNM carried its burden in the proceedings below to meet the statutory requirements for decertification; and (2) whether refusal to decertify PNM's 26.10% interest in SJ-4, while at the same time excluding it from PNM's rate base, violates pertinent due process standards of the New Mexico and United States Constitutions.

*Statutory requirements for decertification.* Section 62-9-5 establishes the criteria that must be met for Commission approval of abandonment:

No utility shall abandon all or any portion of its facilities subject to the jurisdiction of the commission, or any service rendered by means of such facilities, without first obtaining the permission and approval of the commission. The commission shall grant such permission and approval, after notice and hearing, upon finding that the continuation of service is unwarranted or that the present and future public convenience and neces-

sity do not otherwise require the continuation of the service or use of the facility. . . .

Here, the Commission concluded that PNM had failed to carry its burden of showing that public convenience and necessity no longer required the continuing regulation of PNM's interest in SJ-4. In reaching this conclusion, the Commission considered, in addition to the language of Section 62-9-5, the four decertification factors set out in *Commuters' Committee,* 170 Pa.Super. at 604-05, 88 A.2d at 424: (1) the extent of the carrier's loss on the particular branch or portion of the service, and the relation of that loss to the carrier's operation as a whole; (2) the use of the service by the public and prospects for future use; (3) a balancing of the carrier's loss with the inconvenience and hardship to the public upon discontinuance of service; and (4) the availability and adequacy of substitute service.

■ *—Appropriate factors.* PNM contends that the Commission was without authority to consider the *Commuters' Committee* factors in determining the appropriateness of abandonment under the "public convenience and necessity" part of Section 62-9-5. We agree that Section 62-9-5 does not by its terms require consideration of any of the *Commuters' Committee* factors, but only a determination that continuation of service is unwarranted or that the present and future public convenience and necessity do not otherwise require continuation of service or use of the facility. However, we long have recognized the power of agencies to interpret and construe the statutes that are placed, by legislative mandate, within their province. *See, e.g., Public Serv. Co. of N.M. v. New Mexico Pub. Serv. Comm'n,* 106 N.M. 622, 625, 747 P.2d 917, 920 (1987) ("it is well settled that courts should accord deference to the interpretation given to a statute by the agency to which it is addressed"). In other words, by delegating abandonment power to the Commission in such broad terms, our legislature expected that the Commission would develop an appropriate test to fit the regulatory climate. *Cf. Transcontinental Gas Pipe Line Corp. v. Federal Power*

*Comm'n,* 488 F.2d 1325, 1328 (D.C.Cir. 1973) (Federal Power Commission must consider fully all factors relevant to overall public interest under federal statute authorizing abandonment of natural gas facilities when the Commission finds "public convenience and necessity" permits abandonment), *cert. denied,* 417 U.S. 921, 94 S.Ct. 2629, 41 L.Ed.2d 226 (1974); *Consolidated Edison Co. of N.Y., Inc. v. Federal Energy Reg. Comm'n,* 823 F.2d 630, 637 (D.C.Cir.1987) (same, but reviewing court may scrutinize reasons for rules and factors so chosen).

■ The issue before us is not, as PNM would have it, whether the Commission may consider factors not expressly required by the statute, but "whether its *reasons* for doing so in its chosen manner are permissible ones." *Consolidated Edison,* 823 F.2d at 637. PNM offered no argument concerning the Commission's reasons for construing the statute as it did, nor in the proceedings below did PNM offer an alternative construction of the statute. The factors chosen by the Commission reflect the complex regulatory balance that must be struck between the interests of New Mexico energy consumers and those of the utility. The Commission premised its construction of the statute on the observation that the touchstone for certification and abandonment proceedings is the public convenience and necessity, both now and in the future. *Cf. Telstar Communications, Inc. v. Rule Radiophone Serv., Inc.,* 621 P.2d 241, 246 (Wyo.1980) ("public interest is to be given paramount consideration; desires of a utility are secondary"). Faced with no New Mexico precedent construing the operative statutory terms, the Commission adopted a totality of the circumstances approach in which the *Commuters' Committee* factors offer several, but by no means the exclusive, perspectives to be examined.[2] We think the factors so chosen by the Commission permit due consideration of the interests of both the utility and consumers in accordance with the purposes of public utility certification and abandonment. Under these circumstances, we are satisfied that the Commission's decision that "public convenience and necessity" requires consideration of the four *Commuters' Committee* factors was a reasonable exercise of its broad legislative mandate.

■ *—Disjunctive nature of Section 62–9–5.* PNM raises for the first time in this appeal a statutory argument.[3] PNM asserts that the Commission erroneously failed to consider the first disjunctive clause of Section 62–9–5 that authorizes abandonment upon a finding that "continuation of service is unwarranted." We disagree.

Although not artfully crafted, the language and intent of Section 62–9–5 vindicate the Commission's construction. That Section is written in the disjunctive to provide not for alternative bases upon which decertification of facilities is authorized, but for distinct factual scenarios giving rise to abandonment. While the first part of that section refers to "continuation of service," the second part addresses "continuation of the service or use of the facility." Thus, were this case about the necessity of continued electric service to a particular area, the analysis would proceed as PNM suggests. Abandonment of service would

2. The Commission stated: "Consideration of other factors may be appropriate depending on the totality of the circumstances arising in each abandonment case."

3. Indeed, in his recommended decision, the hearing examiner stated that PNM "virtually ignored the pertinent statutory requirements concerning abandonment." At no point in the proceedings below did PNM demonstrate or offer argument concerning the appropriate construction of Section 62–9–5. The only mention of the issue in the record arose in a brief statement in PNM's motion for rehearing where PNM simply reiterated the statutory requirement, but offered no further elaboration on how that requirement was met by its factual showing below. PNM raised and fully argued the issue only in its reply brief before this Court. Under these circumstances we typically would decline PNM's invitation to consider the issue because no decision of the Commission has been presented to us for review. Nonetheless, because the question presented is purely one of statutory interpretation, and because it raises important questions of public utility regulatory policy, we choose to resolve the issue.

be proper if continuation of service is unwarranted or if the present and future public convenience and necessity do not otherwise require. Here, where the operative question turns upon the "use of the facility," the statute authorizes decertification only upon a finding that "the present and future public convenience and necessity do not otherwise require" such use. Accordingly, we find no error in the Commission's sole reliance upon the second part of Section 62-9-5 in determining the propriety of decertification.

—*PNM's burden.* As the movant in the proceedings below, PNM bore the burden to establish the factual predicate upon which the Commission could base its decision to grant or deny abandonment. *See International Minerals & Chem. Corp. v. New Mexico Pub. Serv. Comm'n,* 81 N.M. 280, 283, 466 P.2d 557, 560 (1970) (applying common-law rule that movant bears burden of proof to administrative proceedings); *Michigan Consol. Gas Co. v. Federal Power Comm'n,* 283 F.2d 204, 214 (D.C.Cir.) (applicant for abandonment has burden of making factual showing which will assure Commission that public interest in no way will be disserved), *cert. denied,* 364 U.S. 913, 81 S.Ct. 276, 5 L.Ed.2d 227 (1960).

In this case, as in Case No. 2285, the substance of PNM's factual showing, and the crux of its argument on appeal, was that the final order in the excess capacity case fully discharged its burden in the case below. PNM argues here, and later under a due process theory, that the decision in the excess capacity case to exclude PNM's interest in SJ-4 from its rate base necessarily requires regulatory decertification of that asset. That is, exclusion of an asset from rate base is logically inconsistent with continued regulation of the same asset. We disagree.

The hearing examiner found, and the Commission agreed, that:

PNM has failed to make the requisite showing, or any showing at all for that matter, which would allow the Commission to find that the excluded portion of SJ-4 is not needed for the future public convenience and necessity. To the contrary, the record in this case and in NMPSC Case No. 2146, Part II demonstrates that the resource will be required for the public convenience and necessity in the near future.

*Re Public Serv. Co. of N.M.,* 119 PUR4th at 59.

The Commission found that PNM had presented no testimony to support its claim that it would suffer financial harm if SJ-4 were not decertified, no testimony about the nature and extent of that purported harm, and no testimony giving the exact financial loss that could be attributed to continued regulation. PNM's assertion that "exclusion from rates of the 26.10% interest in that unit ... represents a loss in terms of capital costs alone of $19.8 million a year" falls well short of the required showing. PNM has failed to demonstrate with any degree of certainty the overall impact continued regulation has had on its financial condition. As the Attorney General and counsel for the Commission point out, many elements of the regulatory balance struck in the excess capacity case bear directly on the financial fortunes of PNM, and isolation of losses from SJ-4 from the larger picture of the solution sought in the excess capacity case fails to illuminate PNM's actual financial losses. Since no financial data were filed in the proceedings below, the Commission was unable to balance PNM's claimed financial loss against the prospect of hardship to the public.

Finally, the Commission rejected as inadequate PNM's proffered alternative energy sources. PNM failed to demonstrate how construction of oil or gas-fired peak-load facilities would match the proven affordability of SJ-4. In addition, PNM's suggestion that it could purchase power from other suppliers was directly addressed by the Commission in the excess capacity case: "Nor would it be wise for PNM to rely solely on purchased power for replacement capacity, because the market for such power will probably tighten past the near term." *Re Public Serv. Co. of N.M.,* 101 PUR4th at 174. Accordingly, we affirm the Commission's decision that PNM has

failed to meet its factual burden to permit decertification.

*Constitutionality of continued regulation of the excluded portion of SJ-4.* A more novel issue is presented by PNM's contention that exclusion of its interest in SJ-4 from its rate base, coupled with the Commission's refusal to decertify the facility, violates the due process provisions of the New Mexico and United States Constitutions. N.M. Const. art. II, § 18; U.S. Const. amend. XIV. PNM's constitutional argument rests largely upon the state's power to regulate SJ-4 under the due process clause of the fourteenth amendment. However, in its brief in chief and reply, PNM intimates that the Commission's refusal to decertify SJ-4 also violates the takings clauses of the New Mexico and United States Constitutions. N.M. Const. art. II, § 20; U.S. Const. amend. V. In either case, the crux of PNM's constitutional challenge is that regulation of an asset is constitutionally inconsistent with exclusion of the same asset from its rate base.

In response to PNM's claim that denial of its request to decertify would amount to a taking of its property without just compensation in violation of the fifth and fourteenth amendments of the United States Constitution and Article 2, Section 20 of the New Mexico Constitution, the Commission identified as the relevant constitutional standard the "end result" test articulated by the Supreme Court in *Hope* and *Duquesne Light*. The Commission observed that the rate case (No. 2262) implemented the excess capacity case rulings, including SJ-4 treatment. PNM did not appeal the rate case. These factors, coupled with PNM's failure to establish financial harm from denial of decertification led the Commission to conclude that PNM's constitutional claim was without merit.

■ We agree with the Commission that PNM has failed to make the required factual showing of an uncompensated taking. Nothing in the record below demonstrates with particularity whether (or how) the alleged taking occurred. Nor, assuming that a taking has occurred, does the record establish that the taking was uncompensated

or, if compensated, how the level of compensation was constitutionally deficient. In short, we are unpersuaded that the required factual showing has been made to substantiate PNM's claim of confiscatory taking.

■ Indeed, the thrust of PNM's argument on appeal is premised not on fifth amendment takings jurisprudence, but on the due process clause of the fourteenth amendment. PNM submits that the Commission employed the wrong constitutional standard to measure the constitutionality of the refusal to allow decertification. According to PNM, the "end result" test of *Hope* and *Duquesne Light* responds solely to the highly specialized and narrow issue of confiscatory rate structures, not to alleged takings arising from continued regulation of public utility property. The appropriate standard, according to PNM, is the "public interest" test articulated in *Munn v. Illinois*, 94 U.S. 113, 24 L.Ed. 77 (1877), not the "end result" test of *Hope* and *Duquesne Light*. While we agree that due process considerations limit the power of the legislature to regulate public utilities under its police power, we do not agree with PNM that the due process clause requires decertification in this case.

Drawing upon *Munn*, PNM asserts that the due process clause permits state regulation of private property only when such property is devoted to public use. PNM then argues that the Commission's finding that PNM's interest in SJ-4 should be excluded from its rate base (*i.e.*, the property is not "used and useful") necessarily implies that the property is no longer held for a public purpose. Because it is no longer held for a public purpose, according to PNM, the property is beyond the reach of regulation under the state's police power.

In *Munn*, the Supreme Court embarked on a strand of constitutional analysis that circumscribed the state's authority to regulate business under its police power by determining whether the business was "affected with a public interest." *Id.* at 129. *Compare Tyson & Brother v. Banton*, 273 U.S. 418, 47 S.Ct. 426, 71 L.Ed. 718 (1927) (theater business ticket sales not affected

with public interest) *and Ribnik v. McBride*, 277 U.S. 350, 48 S.Ct. 545, 72 L.Ed. 913 (1928) (same, employment agency practice and rate regulation) *with Budd v. New York*, 143 U.S. 517 (1892) (business of unloading of grain from ships affected with public interest) *and German Alliance Ins. Co. v. Lewis*, 233 U.S. 389, 34 S.Ct. 612, 58 L.Ed. 1011 (1914) (same, insurance business). If so affected, according to the Court, the state could regulate the business, and the Court would not consider the reasonableness of the regulation.[4] The Court in *Munn* found that an Illinois law fixing the maximum charges for grain storage warehouses did not violate the due process clause, because the "virtual monopoly" held by the businesses affected them with a public interest.

While the teaching of *Munn* on the constitutional adequacy of compensation may retain some vitality today (a question we need not decide), the *Munn* public interest analysis has all but disappeared from the modern due process examination of economic regulation. *See, e.g.*, J.E. Nowak, R.D. Rotunda, & J.N. Young, *Constitutional Law* § 11.2, at 347 (3d ed. 1986) (stating that the public interest line of cases, reversed in *Nebbia v. New York*, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934), was as unprincipled as the Court's application of substantive due process doctrine and commerce clause in early part of twentieth century). In *Nebbia v. New York*, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934), the Court abandoned its attempt to establish a peculiar category of industries affected with a public interest and at the same time set new standards for judicial review of economic regulation. The Court stated that the judicial function in analyzing economic regulation "is to determine in each case whether circumstances vindicate the challenged regulation as a reasonable exertion of governmental authority or condemn it as arbitrary or discriminatory." *Id.* at 536, 54 S.Ct. at 515. The evolution of this doctrine since *Nebbia* is such that a court no longer reviews the propriety of legislative objectives, but instead substantially defers to the legislature's perception of the means-end relationship. *See* McCloskey, *Economic Due Process and the Supreme Court: An Exhumation and Reburial*, 1962 Sup.Ct.Rev. 34, 38.

It is beyond peradventure that certification of electric utility property, in the general case, is squarely within the police power under relevant due process considerations. Nor can it be said that Commission certification of SJ–4 exceeded the legislative reach under the due process clause. The particular issue in this case is whether continued regulation of an asset is constitutionally infirm under the *Nebbia* standard when the asset is excluded from the utility's rate base pursuant to a global order remedying excess power capacity. If it were not for a substantial relationship between temporary exclusion of SJ–4 and the global order then, of course, *Hope* and *Duquesne Light* could provide no solace to the Commission.[5] In point of fact, however, that relationship is here present.

---

**4.** We note parenthetically, that the Court quickly abandoned this posture of deference to legislative rate regulation. *See, e.g., Railroad Comm'n Cases*, 116 U.S. 307, 331, 6 S.Ct. 334, 344, 29 L.Ed. 636 (1886); *Reagan v. Farmers' Loan & Trust Co.*, 154 U.S. 362, 14 S.Ct. 1047, 38 L.Ed. 1014 (1894); *Smyth v. Ames*, 169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819 (1898); *see also* McKenna, *The Special Constitutional Status of Public Utility Regulation: From Munn to Duquesne Light*, 21 U.West L.A.L.Rev. 31, 33–37 (1990) (discussing development of public utilities takings jurisprudence).

**5.** Even if we were to accept PNM's proposition that regulation is proper only when the business is affected with a public interest, our result would be the same. The Commission's determination that SJ–4 is not "used and useful" and therefore is not to be included in the utility's rate base, is not dispositive of whether that property is affected with a public interest under *Munn*. SJ–4 became affected with a public interest the moment PNM sought certification. That public interest continues until the Commission deems it no longer in the public interest to continue its jurisdiction over the asset. In the excess capacity case, the Commission concluded that although the facility was not currently used and useful, SJ–4 would be so in the near future. The public interest in SJ–4 lies in the Commission's determination that SJ–4 is instrumental to the future energy balance of New Mexico's energy consumers. As the Commission and the Attorney General point out, decertification proceedings require a balancing different from that struck in rate making proceedings. Because decertification may mean that the asset no long-

■ Certification of public utility facilities is the cornerstone of New Mexico's regulatory scheme. In return for monopoly market power in its industry, the utility must submit to Commission regulation. Before a public utility can begin construction of generating and distribution capacity, it is required to obtain from the Commission a certificate "that public convenience and necessity require or will require such construction or operation." § 62-9-1. Certification regulates competition within the industry, thereby preventing overinvestment in high fixed costs and encouraging the achievement of economies of scale. *See* C. Phillips, *The Regulation of Public Utilities* 516 (2d ed. 1988). The certification process is a less than perfect regulator of generating capacity. *See* Pierce, *The Regulatory Treatment of Mistakes in Retrospect: Canceled Plants and Excess Capacity*, 132 U.Pa.L.Rev. 497, 532-35 (1984) (discussing strengths and shortcomings of certification powers). When, as here, the utility overestimates future energy demand and is strapped with overcapacity, the Commission must determine the appropriate distribution of the costs of this overcapacity between the ratepayers and the utility.

In the excess capacity case, the Commission fashioned just such a remedy. The Commission permanently excluded from its rate base all of PNM's interest in PVNGS Unit 3 and PNM's 105 megawatt power purchase from MSR Public Power Agency. 101 PUR4th at 181. In addition, PNM was allowed to include its interest in PVNGS Units 1 and 2 and in 147 megawatts of SJ-4 in its rate base, as well as the costs of certain older generating plants and the SPS and LAC contracts. *Id.* at 182. The Com-

mission treated PNM's 26.10% interest (130 megawatts) in SJ-4 differently. That asset was excluded with the proviso that "PNM may apply for the inclusion into the Company's rate base of this excluded portion of SJ-4 when said portion is no longer a part of PNM's excess capacity." *Id.* at 181.[6] We recently affirmed that remedy in *Public Service Co. of New Mexico v. New Mexico Public Service Commission*, 111 N.M. 622, 808 P.2d 592 (1991).

In the proceedings below, the Commission noted, and factored into its decision not to decertify, the special treatment accorded SJ-4 in the excess capacity case. According to the Commission, SJ-4 was not intended to be excluded or held in capacity reserve for the full life of the plant. 119 PUR4th at 54. The Commission found that SJ-4 is an economical power source with substantial usable remaining life. Because decertification would likely deprive New Mexico energy consumers of the public benefit of the asset, and because PNM failed to muster any showing of financial harm suffered as a result of continued regulation, the Commission concluded that the public interest was best served by continued regulation.[7] *Id.* We cannot conclude, under these circumstances, that the Commission's actions were either arbitrary or discriminatory. The Commission's final order is affirmed.

IT IS SO ORDERED.

SOSA, C.J., and BACA, J., concur.

---

er will be available to the energy consuming public, the Commission is permitted to affix greater significance to the public interest in determining the propriety of facility decertification. · *See Rule Radiophone Serv., Inc.*, 621 P.2d at 246. Considered in isolation, PNM's argument has considerable intuitive appeal. When, however, we place this case within the peculiar context of state sanctioned monopoly and take judicial notice of the carefully constructed rate balance in Case No. 2262, we are satisfied that the process of law due PNM in this case has been delivered.

6. Indeed, in Case No. 2296, the Commission recognized this different treatment when it observed that under the excess capacity case balancing, it was anticipated "that SJ-4 would be the first capacity source allowed in rate base as soon as it became used and useful." 119 PUR4th at 54.

7. The Commission did not foreclose the possibility of future decertification of SJ-4. Rather, the Commission observed that PNM could reapply for decertification when it was prepared to make the required factual showing.