1999-NMSC-019

980 P.2d 55

STATE of New Mexico, ex rel., Jerry W. SANDEL, Roberto J. Gonzales, Ted Hobbs, Larry Larranaga, Shannon Robinson, John Arthur Smith, Stuart Ingle, William H. Payne, Chris Fretze, and Bruce E. Barnaby, Petitioners,

v.

NEW MEXICO PUBLIC UTILITY COMMISSION, Wayne Shirley, Commission Chairman, Beatriz Rivera, Commissioner, and Robert Schwartz, Commissioner, Respondents,

and

New Mexico Industrial Energy Consumers, Residential Electric Incorporated, Public Service Company of New Mexico, and Attorney General of the State of New Mexico, Intervenors.

In the Matter of the Application of and the Complaint by Residential Electric, Incorporated,

and

In the Matter of the Application of Residential Electric, Incorporated for a Certificate of Public Convenience and Necessity.

Public Service Company of New Mexico, Appellant,

v.

New Mexico Public Utility Commission, Appellee,

and

Residential Electric, Incorporated, and New Mexico Industrial Energy Consumers, Intervenors.

In the Matter of the Application of Residential Electric, Incorporated, for a Certificate of Public Convenience and Necessity.

Attorney General of the State of New Mexico, Appellant,

v.

New Mexico Public Utility Commission, Appellee.

Nos. 25,523, 25,531, 25,532.

Supreme Court of New Mexico.

March 15, 1999.

Rehearing Denied April 27, 1999.

Shannon Robinson, Albuquerque, NM, William H. Payne, Albuquerque, NM, Jones, Snead, Wertheim, Wentworth & Jaramillo, P.A., Jerry Wertheim, Arturo L. Jaramillo, Jerry Todd Wertheim, Carol Clifford, John V. Wertheim, Santa Fe, NM, for Petitioners.

Patrick T. Ortiz, Sara D. Smith, Albuquerque, NM, Keleher & McLeod, P.A., Richard B. Cole, Thomas C. Bird, Susan M. McCormack, Albuquerque, NM, for Appellants.

Hon. Patricia A. Madrid, Attorney General, Alletta Belin, Jeff Taylor, Assistant Attorneys General, Santa Fe, NM, for Intervenor/Appellant.

James C. Martin, General Counsel, Santa Fe, NM, for New Mexico Public Regulatory Commission, Respondents/Appellee.

Lewis O. Campbell, Diane P. Donaghy, Cynthia A. Fry, L. Bernice Galloway, Albuquerque, NM, for Residential Electric, Inc., Intervenor.

Steven S. Michel, Karl O. Wyler, Santa Fe, NM, for New Mexico Industrial Energy Consumers, Intervenor.

Rubin, Katz, Salazar, Alley & Rouse, P.C., Donald M. Salazar, Santa Fe, NM, for Texas-New Mexico Power Company, Intervenor.

Cohen & Cohen, P.A., David S. Cohen, Santa Fe, NM, Edward H. Comer, Andrew Kartz, Johannes Williams, Laurence Hindin, Washington, DC, for Edison Electric Institute, Amicus Curiae.

## OPINION

MINZNER, Chief Justice.

{1} On December 21, 1998, several members of the New Mexico Legislature, along with representatives from a labor union and a public utility shareholders group, petitioned this Court for a writ of mandamus vacating two orders issued by the New Mexico Public Utility Commission (NMPUC). One of these orders (the REI Order) approved a request by Residential Electric, Inc. (REI) to charge retail consumers a market-based rate for electricity, required the Public Service Company of New Mexico (PNM) to open its transmission and distribution system to REI, and granted a certificate of public convenience and necessity (CCN) that allows REI to own and operate transmission and distribution facilities that serve the metropolitan areas of Albuquerque, Rio Rancho, and Santa Fe. Among other things, the second NMPUC order that is the subject of the petition (the PNM Order) required PNM to reduce its rates based on a revaluation of PNM's generation costs that employed an estimated market price. Petitioners assert that these two orders of the NMPUC violate the requirement of separation of powers contained in Article III, Section 1 of the New Mexico Constitution because they bring about the deregulation of the retail electric power industry in New Mexico without authorization from the Legislature.

{2} This Court assumed original jurisdiction over the petition under Article VI, Section 3 of the New Mexico Constitution and consolidated Petitioners' case with three appeals that had been filed by PNM and the Attorney General. All of the consolidated cases arise from the two NMPUC orders which are the subject of the petition. After hearing oral argument in these consolidated cases on March 1, 1999, we issued an order granting the petition for a writ of mandamus in part, vacating the REI Order, and dismissing the remaining appeals in the REI case as moot. In an unpublished decision filed concurrently with this opinion, we vacate the

PNM Order under NMSA 1978, § 62–11–5 (1982, prior to 1998 amendment), and deny the petition for a writ of mandamus with respect to that order. In this opinion, we explain the reasons for our decision to issue the writ of mandamus with respect to the REI Order.

## I.

{3}   In 1941, the New Mexico Legislature enacted the New Mexico Public Utilities Act (NMPUA), 1941 N.M.Laws, ch. 84 (codified in its present form at NMSA 1978, §§ 62–1–1 to 62–6–26.1, 62–8–1 to 62–13–14) (1941, as amended through 1997, prior to 1998 amendment).[1]  The NMPUA was enacted against the backdrop of a series of state and federal statutes that regulate access to the consumer market, changes in rates, and use of financing and securities by public utilities engaged in the sale of natural gas, water, and electricity.  *See generally* Robert L. Swartwout, *Current Utility Regulatory Practice from a Historical Perspective*, 32 Nat. Resources J. 289, 300–08 (1992).  These federal statutes include the Federal Power Act of 1920 (FPA), 16 U.S .C. §§ 791a to 828c (1994 & Supp. II 1996), the Public Utility Holding Company Act of 1935 (PUHCA), 15 U.S.C. §§ 79 to 79z–6 (1994 & Supp. II 1996), and the Natural Gas Act of 1938 (NGA), 15 U.S.C. §§ 717 to 717w (1994).

{4}   Under the regulatory regime established by the NMPUA and its federal counterparts in the 1930s and 1940s, electricity and the services required to deliver it were sold in a "bundled" package to retail customers by traditional, "vertically integrated" utilities that owned and operated all components of the electric power industry within a specific geographic area.  These components include the generation of electricity at power plants, the transmission of electricity at high voltage from the point of generation to areas of distribution, and the distribution of electricity through substations where high transmission voltage is reduced to a lower voltage and then delivered to retail customers.  A utility that is granted exclusive control of all of these components within a specific geographic area under this regulatory regime has been described as a " 'regulated monopoly.' "  *Morningstar Water Users Ass'n v.*

*New Mexico Pub. Util. Comm'n,* 120 N.M. 579, 590, 904 P.2d 28, 39 (1995) (quoting *Dickinson v. Maine Pub. Serv. Co.,* 223 A.2d 435, 438 (Me.1966)).  Such a utility is said to acquire its exclusive control of the industry in a particular area, as well as a fair opportunity to secure a reasonable rate of return on approved investments, in exchange for providing reliable, nondiscriminatory service to all ratepayers in that area.  *See id.* at 590–91, 904 P.2d at 39–40.

{5}   Beginning in the 1970s, the regulatory regime established in the 1930s and 1940s underwent significant changes at the federal level.  Congress introduced competition into the generation component of the electric power industry by enacting the Public Utility Regulatory Policies Act of 1978 (PURPA), Pub.L. No. 95–617, 92 Stat. 3117 (codified as amended in scattered sections of 15, 16, 42, and 43 U.S.C.), and deregulated the wellhead price for certain categories of natural gas by enacting the Natural Gas Policy Act of 1978 (NGPA), Pub.L. No. 95–621, 92 Stat. 3350 (codified as amended in scattered sections of 15 U.S.C.).  These changes led to the deregulation of the natural gas industry.  *See, e.g.,* Federal Energy Regulatory Commission (FERC) Order No. 636, 57 Fed.Reg. 13,267 (1992) (codified as amended at 18 C.F.R. pt. 284 (1998)) (providing open access to any party seeking to move its own natural gas supplies through the nation's privately owned pipeline systems);  NMSA 1978, § 62–6–4.1(B) (1993, prior to 1998 amendment) (authorizing the NMPUC to "require the nondiscriminatory and nonpreferential transportation of natural gas by any person subject to [its] jurisdiction").  They also set the stage for generators of electricity to gain access to, and compete in, a nationwide wholesale market through a process known as "wheeling."  "Wheeling" has been defined as "[t]he transmission of electricity by an entity that does not own or directly use the power it is transmitting."  James D. Elliott, Comment, *Electric Utility Regulation Reform in New York: Economic Competitiveness at the Expense of the Environment?,* 13 Pace Envtl.L.Rev. 281,

---

1. Since the petition in this case predates the effective date of the 1998 amendments to the

NMPUA, we do not consider the effect, if any, of these amendments.

282 n. 1 (1995) (alteration in original) (internal quotation marks omitted).

{6} Congress supplemented FERC's authority to order wheeling at the wholesale level by enacting the Energy Policy Act of 1992 (EPA), Pub.L. No. 102–486, 106 Stat. 2776 (codified as amended in scattered sections of 16, 25, 26, 30, and 42 U.S.C.). Under the 1992 legislation, PURPA was amended to provide FERC with the authority to require utilities to justify their refusal to provide transmission service to any party requesting it, *see* 16 U.S.C. § 824j(d)(1) (1994), and to order utilities to provide transmission service and "network service" to any entity, *see id.* § 824j(a). " 'Network service' allows a third party to utilize all features of a transmission system to the same extent that the transmission facility's owner may utilize the system." Michael Evan Stern & Margaret M. Mlynczak Stern, *A Critical Overview of the Economic and Environmental Consequences of the Deregulation of the U.S. Electric Power Industry,* 4 Envtl.Law. 79, 92 n. 51 (1997) (quoting FERC Order No. 888, 61 Fed.Reg. 21,540, 21,547 (1996) (preface to regulations now codified at 18 C.F.R. pts. 35, 385 (1998))).

{7} FERC exercised this new statutory authority by publishing its "Open Access" Rules on May 10, 1996. *See* FERC Order No. 888, 61 Fed.Reg. at 21,540; FERC Order No. 889, 61 Fed.Reg. 21,737 (1996) (codified as amended at 18 C.F.R. pt. 37 (1998)). FERC's Open Access Rules have been described as "the legal, functional, and regulatory prerequisite to the implementation of nationwide deregulation of the electric utility business." Stern & Stern, *supra,* at 95.

> The orders provide access to the nationwide wholesale distribution system, thus addressing the generators' desire to reach distant markets. Pursuant to the Open Access Rule[s], consumers would receive the "product" sold by distant generators through their local utility's existing distribution system, which would continue to be regulated, as it has been historically, by state PUC's.

*Id.* FERC's Open Access Rules also allow utilities to recover certain kinds of "stranded costs" occasioned by federal deregulation of the wholesale market for electricity. "[S]tranded costs ... can be defined as those costs that ... utilities currently are permitted to recover through their rates but whose recovery may be impeded or prevented by the advent of competition in the industry." William J. Baumol & J. Gregory Sidak, *Stranded Costs,* 18 Harv.J.L. & Pub. Pol'y 835, 835 (1995); *accord* Stern & Stern, *supra,* at 121 n. 240. The issue of stranded costs occasioned by deregulation at the retail level, however, is left for "state regulatory authorities to deal with." FERC Order No. 888, 61 Fed.Reg. at 21,650.

{8} Thus, while deregulating the electric power industry at the wholesale level, current federal law leaves open the questions whether and under what conditions local utilities within New Mexico should be required to open their distribution systems to "retail wheeling" so that their customers can choose to purchase electricity from other sellers. " 'Retail wheeling refers to the ability of a retail customer, e.g. homeowner or small business ..., to purchase electricity directly from a variety of electricity producers instead of the local distribution utility.' " Stern & Stern, *supra,* at 105 n. 144 (quoting Elliott, *supra,* at 282 n. 1). At the time we issued the writ of mandamus in this matter, bills to deregulate the local, retail side of the electric power industry were pending in both the New Mexico Legislature, *see, e.g.,* S. 428, 44th Leg., 1st Sess. (N.M.1999), and in Congress, *see, e.g.,* H.R. 667, 106th Cong. (1999).

## II.

{9} The question we address in this opinion is whether the REI Order exceeds the NMPUC's authority and violates the provisions in our state constitution requiring separation of powers by effectively deregulating the retail side of the electric power industry in New Mexico in the absence of a statutory mandate from the Legislature. According to REI and the NMPUC, the REI Order should be viewed as no more than an ordinary exercise of the NMPUC's statutory authority to grant CCNs, approve rates, and require a public utility to provide reasonable and efficient services. According to Petitioners, the end result of the NMPUC's actions is to

accomplish an unauthorized deregulation of the retail market for electricity in Albuquerque, Rio Rancho, and Santa Fe by opening the market in those areas to any companies who wish to use PNM's distribution system to sell electricity to retail consumers at whatever price an open market will sustain.

■ {10} Before addressing these contentions, we respond to the assertion of REI and the NMPUC that a writ of mandamus is an inappropriate means of vacating the REI order. We disagree with this assertion. This Court's power to vacate the NMPUC's order by issuing a writ of mandamus is derived from Article VI, Section 3 of the New Mexico Constitution. While Section 62–12–2 provides additional, statutory authority for issuance of writs of mandamus by the district courts "to restrain [the PUC] and its members from the exercise of jurisdiction not by this act conferred," Article VI, Section 3 and Article VI, Section 13 of our state constitution together grant concurrent jurisdiction in mandamus to both the Supreme Court and the district courts. *See State ex rel. Bird v. Apodaca,* 91 N.M. 279, 282, 573 P.2d 213, 216 (1977).

■ {11} "This Court on several occasions has recognized that mandamus is an appropriate means to prohibit unlawful or unconstitutional official action." *State ex rel. Clark v. Johnson,* 120 N.M. 562, 570, 904 P.2d 11, 19 (1995). In particular, the Court has exercised its original jurisdiction in mandamus instances where a petitioner sought to restrain one branch of government from unduly encroaching or interfering with the authority of another branch in violation of Article III, Section 1 of our state constitution. *See State ex rel. Taylor v. Johnson,* 1998–NMSC–015, ¶ 17, 125 N.M. 343, 961 P.2d 768. Such an exercise may be appropriate when the petitioner presents a purely legal issue concerning the non-discretionary duty of a government official that (1) implicates fundamental constitutional questions of great public importance, (2) can be answered on the basis of virtually undisputed facts, and (3) calls for an expeditious resolution that cannot be obtained through other channels such as a direct appeal. *See Clark,* 120 N.M. at 569, 904 P.2d at 18. We conclude that these

criteria are met in this case because we limit the exercise of our jurisdiction to the purely legal issue of whether the REI Order, on its face, exceeds the NMPUC's statutory authority and intrudes upon the province of the Legislature in violation of Article III, Section 1 of the New Mexico Constitution.

■ {12} With regard to this issue, the Court has recognized that Article III, Section 1 of our state constitution "allows some overlap in the exercise of governmental function." *Mowrer v. Rusk,* 95 N.M. 48, 53, 618 P.2d 886, 891 (1980). Thus, while paying heed to "the unique position of the Legislature in creating and developing public policy," *Taylor,* 1998–NMSC–015, ¶ 21, 125 N.M. 343, 961 P.2d 768, the Court has acknowledged that "[e]lected executive officials and executive agencies also make policy, to a lesser extent, as authorized by the constitution or the legislature," *Torres v. State,* 119 N.M. 609, 612, 894 P.2d 386, 389 (1995). For this reason, the Court generally will not hold that the policymaking of an administrative agency violates separation of powers principles unless such administrative policymaking "conflict[s] with or infringe[s] upon what is the essence of legislative authority—the making of law." *Clark,* 120 N.M. at 573, 904 P.2d at 22. Such an unlawful conflict or infringement occurs when an administrative agency goes beyond the existing New Mexico statutes or case law it is charged with administering and claims the authority to modify this existing law or to create new law on its own. *See Taylor,* 1998–NMSC–015, ¶ 24, 125 N.M. 343, 961 P.2d 768; *Clark,* 120 N.M. at 573–76, 904 P.2d at 22–25.

■ {13} The nature and extent of the NMPUC's authority was defined by the Legislature when it enacted and amended the NMPUA. *See* Sections 62–5–1, 62–6–1 to – 26.1; *cf. PNM Elec. Servs. v. New Mexico Pub. Util. Comm'n (In re PNM Elec. Servs.),* 1998–NMSC–017, ¶ 10, 125 N.M. 302, 961 P.2d 147 ("Statutes create administrative agencies, and agencies are limited to the power and authority that is expressly granted and necessarily implied by statute."). To determine the intended scope of the NMPUC's authority, the NMPUA must be

read as a whole, *see High Ridge Hinkle Joint Venture v. City of Albuquerque,* 1998–NMSC–050, ¶ 5, 126 N.M. 413, 970 P.2d 599, and harmonized with other statutes concerning the same subject matter, *see State ex rel. Schwartz v. Sanchez,* 1997–NMSC–021, ¶ 7, 123 N.M. 165, 936 P.2d 334; *Quintana v. New Mexico Dep't of Corrections,* 100 N.M. 224, 225, 668 P.2d 1101, 1102 (1983).

■ {14} In addition, the Court may view cases from other jurisdictions interpreting practically identical statutory language as persuasive authority. *See State v. Warsop,* 1998–NMCA–033, ¶ 10, 124 N.M. 683, 954 P.2d 748, *cert. denied,* 124 N.M. 589, 953 P.2d 1087 (1998); *cf. Arkansas Louisiana Gas Co. v. Hall,* 453 U.S. 571, 577 n. 7, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981) (noting that the United States Supreme Court has used its interpretations of federal energy statutes interchangeably when the relevant provisions of those statutes " 'are in all material respects substantially identical' " (quoting *FPC v. Sierra Pac. Power Co.,* 350 U.S. 348, 353, 76 S.Ct. 368, 100 L.Ed. 388 (1956))). In this regard, we note that the Court has developed a body of case law interpreting the NMPUA that relies in many instances on the United States Supreme Court's interpretation of similar language in related federal statutes. *See, e.g., Behles v. New Mexico Pub. Serv. Comm'n (In re Timberon Water Co.),* 114 N.M. 154, 161, 836 P.2d 73, 80 (1992) (citing *FPC v. Hope Natural Gas Co.,* 320 U.S. 591, 603, 64 S.Ct. 281, 88 L.Ed. 333 (1944)); *Public Serv. Co. v. New Mexico Pub. Serv. Comm'n (In re Public Serv. Co.),* 112 N.M. 379, 382, 385–86, 815 P.2d 1169, 1172, 1175–76 (1991) (same); *Attorney Gen. v. New Mexico Pub. Serv. Comm'n (In re Prudence of Costs Incurred by Public Serv. Co.),* 111 N.M. 636, 642, 808 P.2d 606, 612 (1991) (same); *New Mexico Indus. Energy Consumers v. New Mexico Pub. Serv. Comm'n (In re Alternatives to the Inventorying Ratemaking Methodology),* 111 N.M. 622, 633, 808 P.2d 592, 603 (1991) (same); *cf. State Corp. Comm'n v. Mountain States Tel. & Tel. Co.,* 58 N.M. 260, 271–73, 270 P.2d 685, 692–93 (1954) (citing *Hope Natural Gas Co.* in support of an interpretation of the "just and reasonable" standard in a removal action under N.M. Const. art. XI, § 7 (repealed effective 1999)); *State v. Mountain States Tel. & Tel. Co.,* 54 N.M. 315, 334–37, 224 P.2d 155, 168–70 (1950) (same).

{15} Under these interpretations, the NMPUC is

"not bound to the use of any single formula or combination of formulae in determining rates. Its rate-making function ... involves the making of 'pragmatic adjustments.' And when the [NMPUC's] order is challenged in the court, the question is whether that order 'viewed in its entirety' meets the requirements of the [NMPUA]. Under the statutory standard of 'just and reasonable' it is the result reached not the method employed which is controlling."

*Mountain States Tel. & Tel. Co.,* 54 N.M. at 335, 224 P.2d at 169 (quoting *Hope Natural Gas Co.,* 320 U.S. at 602, 64 S.Ct. 281 (citations omitted)). Thus, in a rate case, the NMPUC " 'is vested with considerable discretion in determining the justness and reasonableness of utility rates,' " *In re Timberon Water Co.,* 114 N.M. at 161, 836 P.2d at 80 (quoting *Attorney Gen. v. New Mexico Pub. Serv. Comm'n,* 101 N.M. 549, 553, 685 P.2d 957, 961 (1984)).

■ {16} This "considerable discretion" does not mean, however, that the NMPUC's authority is boundless. In particular, the changes that have taken place in the regulation of the electric power industry at the federal level do not give the NMPUC the authority to erase the NMPUA as it is presently written. As we stated in *Taylor,* 1998–NMSC–015, ¶ 42, 125 N.M. 343, 961 P.2d 768, "federal law cannot enlarge state executive power beyond that conferred by the state constitution."

■■ {17} Further, while courts ordinarily afford a degree of deference to an agency's interpretation of a statute the agency is charged with administering, *see High Ridge Hinkle Joint Venture,* 1998–NMSC–050, ¶ 5, 126 N.M. 413, 970 P.2d 599, such deference does not give the NMPUC the authority to " 'pour any meaning' it desires into the statute." *Farmers Union Cent. Exch., Inc. v. FERC,* 734 F.2d 1486, 1504 (D.C.Cir.1984). Because we cannot " 'read into a statute or ordinance language which is

not there, particularly if it makes sense as written,'" *High Ridge Hinkle Joint Venture,* 1998–NMSC–050, ¶ 5, 126 N.M. 413, 970 P.2d 599 (quoting *Burroughs v. Board of County Comm'rs,* 88 N.M. 303, 306, 540 P.2d 233, 236 (1975)), we cannot read the NMPUA as authorizing the NMPUC to abdicate its statutory responsibilities by "set[ting] at naught an explicit provision of the Act." *FPC v. Texaco Inc.,* 417 U.S. 380, 394, 399, 94 S.Ct. 2315, 41 L.Ed.2d 141 (1974).

{18} Section 62–3–1(B) of the NMPUA declares the policy of the state to be that:

the public interest, the interest of consumers and the interest of investors require the regulation and supervision of . . . public utilities to the end that reasonable and proper services shall be available at fair, just and reasonable rates, and to the end that capital and investment may be encouraged and attracted so as to provide for the construction, development and extension, without unnecessary duplication and economic waste, of proper plants and facilities for the rendition of service to the general public and to industry.

*Cf. Hope Natural Gas Co.,* 320 U.S. at 611, 64 S.Ct. 281 ("The fixing of 'just and reasonable rates' . . . with the powers attendant thereto was the heart of the new regulatory system." (footnote omitted)). To achieve these ends, the NMPUA established the NMPUC as the administrative body charged with regulating and supervising public utilities and the rates they charge, *see* Sections 62–6–4(A), –8–7(D), and required the NMPUC to measure the rates of public utilities according to a "just and reasonable" standard, *see* Section 62–8–1 ("Every rate made, demanded or received by any public utility shall be just and reasonable."); *cf. Duquesne Light Co. v. Pennsylvania Pub. Util. Comm'n,* 715 A.2d 540, 544 (Pa. Commw.Ct.1998) ("The overriding principle governing the [Pennsylvania's Public Utility] Commission's performance of its duty is to determine just and reasonable rates."). This "just and reasonable" standard, and its corollaries, also inform the NMPUC's regulation and supervision of other aspects of a public utility's service under the NMPUA. *See, e.g.,* Section 62–9–1 (requiring claims of un-

reasonable interference between two or more public utilities to be resolved in accordance with the "just and reasonable" standard).

{19} In issuing the REI Order, the NMPUC purported to act pursuant to its authority to grant CCNs under Section 62–9–6, approve rates under Section 62–8–7, and require a public utility to provide efficient and reasonable service under Section 62–8–2. When viewed in its entirety and with a focus on its end result, *see Hope Natural Gas Co.,* 320 U.S. at 602, 64 S.Ct. 281, it is apparent that the NMPUC has done something else. Throughout the REI Order, the NMPUC makes sweeping pronouncements such as: "It is the better public policy to always subject utilities to the checks and balances of competition," and "[t]he public interest is not served by a policy framework that steadfastly holds to a now defunct scheme." These pronouncements make clear that the purpose of the REI Order is to carry out broad changes in public policy by replacing regulation under the "just and reasonable" standard with competition in an open marketplace.

{20} With respect to REI's application for a CCN, the NMPUC bases its decision on the meaning it attributes to the statutory terms "public convenience and necessity," "unnecessary duplication," and "economic waste," as they appear in Section 62–9–6. With respect to "public convenience and necessity," the NMPUC concludes that "electricity has become a necessity of modern life," and therefore "the public clearly requires access to electricity, in a convenient manner." "[N]ecessity being somewhat of a given," the NMPUC then infers that "it is clearly more convenient for the public if it has two choices rather than just one," and that "as competitive pressures are brought to bear on PNM's prices, all consumers should benefit." By equating "public convenience and necessity" with competition in this manner, the NMPUC makes clear that its purpose in granting a CCN to REI is to deregulate New Mexico's retail market for electricity.

{21} This definition of "public convenience and necessity" also forms the basis for the NMPUC's determination that PNM

must unbundle its transmission and distribution services and offer them to REI so that REI in turn may sell electricity directly to retail customers. The NMPUC accomplishes this unbundling under the guise of Section 62–8–2, which requires "[e]very public utility [to] furnish adequate, efficient and reasonable service." The NMPUC takes the requirement of "reasonable service" to mean that PNM must furnish "service that meets the public's convenience and that meets its needs." Because, according to the REI Order, "it is clearly more convenient for the public if it has two choices rather than one," the NMPUC concludes that PNM must unbundle its services so that the public may have two choices for the generation of its electricity, namely PNM and REI.

{22} The NMPUC takes the requirement of "efficient service" in Section 62–8–2 to mean the service that a competitive market would yield if "functioning properly." Thus, according to the REI Order, "[w]here competitive markets do exist ... there is no need to substitute an administrative judgment for the judgment of the market ." Again, the equation of "efficient and reasonable service" with whatever service results from the functioning of a competitive market serves to fulfill the NMPUC's underlying goal of deregulating the retail market for electricity in New Mexico.

{23} The NMPUC's definitions of "unnecessary duplication" and "economic waste" also serve this purpose. The NMPUC concludes that "[i]n the case of generation [of electricity], any duplication should properly be viewed as supplemental or as necessary duplication," apparently because "the generation supply ... operates today in a highly competitive market." The NMPUC then avoids the question of duplicative transmission or distribution facilities by noting REI's intention "to construct or upgrade facilities only to the extent existing facilities would be insufficient to provide the service." In addition, the NMPUC concludes that granting a CCN to REI would not result in economic waste "[b]ecause REI does not propose to set its prices on the basis of book costs, [and therefore] it has no incentive to overinvest."

{24} By defining economic waste in terms of the basis for REI's proposed rates, the NMPUC joins the issue of REI's application for a CCN under Section 62–9–6 with the issue of approving REI's proposed rates under Section 62–8–7. Like the order set aside by the United States Supreme Court in *Texaco*, 417 U.S. at 396, 94 S.Ct. 2315, the NMPUC's discussion of REI's application for rate approval "does not expressly mention the just-and-reasonable standard" under Section 62–8–1. Indeed, the NMPUC's order does not even state what REI's actual approved rates are. Instead, the NMPUC simply concludes that "[w]here, as here, the rates are proposed to be set by market forces, rather than by conventional cost structures, the Commission may allow considerable flexibility in the setting of the rate." On this basis, the NMPUC approves "REI's use of a market-based rate" and allows the company to make rate changes "without hearing, so long as the rate to be charged is equal to or less than the highest rate currently offered by any other provider." Further, in approving REI's rate proposal, the NMPUC notes REI's recognition "that other companies like REI could enter the market at any time."

{25} The NMPUC's discussion of the declaration of policy contained in Section 62–3–1(B) is reserved for the issue of "stranded costs" that PNM claims it will incur if required to function in a competitive retail market for electricity. In this discussion, the NMPUC identifies Section 62–3–1(B) as a "clear statement of policy directed toward assuming an efficient use of societ[y']s resources." And since the REI Order equates efficiency with the prices and services that result from the functioning of a competitive market, the NMPUC concludes that "[a]ccess to the customer market at market-based prices is sufficient opportunity for the utility to earn a fair return on the fair value on the assets employed for that purpose." Further, "[b]ecause stranded costs are the measurement of the amount by which PNM's price requirements exceed a competitive or efficient market," the NMPUC concludes that "[a]s a matter of law, utilities are not entitled to stranded cost recovery." For this reason, the NMPUC refuses to consider any factors

that are not market-based in its discussion of whether the REI Order affords PNM a fair opportunity to secure a reasonable rate of return.

{26} Based on our review of the REI Order, we conclude that the NMPUC has violated Article III, Section 1 of the New Mexico Constitution by undertaking to deregulate the electric power industry in New Mexico in a manner that is beyond the scope of the authority granted to the NMPUC by the Legislature. In particular, the NMPUC has chosen to abdicate its statutory responsibilities by attributing a meaning to the NMPUA that cannot be reconciled with the statute's declared policy of "requir[ing] the regulation and supervision of . . . public utilities to the end that reasonable and proper services shall be available at fair, just and reasonable rates." Section 62–3–1(B). The NMPUC's actions with respect to the REI Order also conflict with the "well established judicial interpretation [of the 'just and reasonable' standard] that structures administrative discretion under the statute," *Farmers Union*, 734 F.2d at 1504.

{27} We note that the REI Order makes no attempt to reconcile its novel construction of the NMPUA with longstanding prior interpretations of the statute recognized by this Court and employed by the NMPUC and its predecessors for many years. *See, e.g., Farmers' Elec. Coop. v. Southwestern Pub. Serv. Co.*, 125 Pub.Util.Rep. 4th (PUR) 449, 467 (N.M.Pub.Serv.Comm'n 1991) ("The NMPUA expresses a clear intent to displace competition with regulation in the area of utility service."), *quoted in City of Albuquerque v. New Mexico Pub. Serv. Comm'n*, 115 N.M. 521, 534, 854 P.2d 348, 362 (1993); *In re Public Serv. Co.*, 112 N.M. at 387, 815 P.2d at 1177 (concluding that certification under Section 62–9–1 "regulates competition within the industry"). In particular, the REI Order cites no authority to support the NMPUC's assertion that the NMPUA, "since its origin, has always embodied competition as a possible alternative to traditional regulation." Contrary to this assertion, the REI Order appears to discard "the whole experience under the [NMPUA]," leaving "no anchor, as it were, . . . to hold the terms 'just and reason-

able' to some recognizable meaning." *City of Detroit v. Federal Power Comm'n*, 230 F.2d 810, 818–19 (D.C.Cir.1955); *accord Farmers Union*, 734 F.2d at 1501.

▮▮▮ {28} Under these circumstances, we will not defer to the NMPUC's unexplained departure from the longstanding prior construction of the NMPUA. *See High Ridge Hinkle Joint Venture*, 1998–NMSC–050, ¶¶ 7–9, 126 N.M. 413, 970 P.2d 599. The fact that the NMPUC has recited the statutory terminology in its orders and attempted to pour a new meaning into that terminology is not sufficient to show that the NMPUC has acted within its authority and carried out its responsibilities under the NMPUA. *See Farmers Union*, 734 F.2d at 1504. By redefining the NMPUA's terminology so as "to set at naught an explicit provision of the Act," *Texaco*, 417 U.S. at 394, 94 S.Ct. 2315, the NMPUC has gone beyond the type of limited administrative policymaking that we recognized in *Torres*, 119 N.M. at 612, 894 P.2d at 389, and embarked on a path that "conflict[s] with or infringe[s] upon what is the essence of legislative authority—the making of law." *Clark*, 120 N.M. at 573, 904 P.2d at 22. Thus, we conclude that the NMPUC has exceeded its authority in violation of Article III, Section 1 of the New Mexico Constitution.

{29} Our conclusion that the NMPUC has exceeded its statutory authority does not rely on any preconceptions or predictions about what policy choices Congress or the Legislature will make in response to the nationwide trend toward deregulation of the electric power industry. As the Court noted in *City of Albuquerque*, 115 N.M. at 534, 854 P.2d at 362, "we have no crystal ball and can only apply New Mexico law as it is presently written." As it is presently written, the NMPUA does not grant the NMPUC the authority to reconfigure the retail side of the electric power industry in the manner contemplated in the REI Order.

**III.**

{30} The end result of the REI order issued by the NMPUC is to deregulate the retail side of the electric power industry in New Mexico in a manner inconsistent with

the current regulatory scheme of the NMPUA that the NMPUC is charged with administering. In ordering this result, the NMPUC has unlawfully intruded on the province of the Legislature. Thus, we issued our writ of mandamus vacating the REI order.

{31}  **IT IS SO ORDERED.**

FRANCHINI and SERNA, JJ., concur.

